**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louise Andrich, et al., | No. CV-19-02212-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Gus Kostas, et al., | |
| Defendants. | |

This lawsuit arises from the fatal shooting in June 2018 of Alexandre Andrich by Phoenix Police Department ("PPD") Officer Gus Kostas. (Doc. 18 at 2.) The plaintiffs are Louise Andrich, who is suing both in her individual capacity as Mr. Andrich's sister and as the administrator of Mr. Andrich's estate ("the Estate"), as well as AL.A. and AM.A., who are minor siblings of Mr. Andrich (collectively, "Plaintiffs"). (*Id.*) Mr. Andrich's mother, Angela Hernandez, who gave up all custody rights to Mr. Andrich in 1991 (*id.* ¶ 13), was previously a nominal defendant but Plaintiffs have since stipulated to her dismissal (Doc. 16).

Now pending before the Court is a motion to dismiss filed by Officer Kostas, fellow PPD Officer Brian Peters, and the City of Phoenix ("the City") (collectively, "Defendants"). (Doc. 26.) For the following reasons, the motion will be granted in part and denied in part.

…

…

**BACKGROUND**

I.    <u>Factual Background</u>

The sparse facts alleged in the first amended complaint ("FAC") are as follows. At 7:15 a.m. on June 12, 2018, PPD Officers Kostas and Peters "contacted" Mr. Andrich at First Avenue and Osborn Road in Phoenix. (Doc. 18 ¶ 19.) The FAC does not state why they contacted him but does allege they "had no probable cause, reasonable suspicion, or lawful reason to seize or detain [Mr. Andrich]." (*Id.* ¶ 22.) At the time, Mr. Andrich "was unarmed and never posed a threat to anyone." (*Id.* ¶ 21.) Mr. Andrich also "suffered from a mental disability of schizophrenia which was readily apparent." (*Id.* ¶ 19.) Nevertheless, Officer Kostas attempted to "detain and/or seize" Mr. Andrich, and then, as Mr. Andrich was "turning away," Officer Kostas "fatally shot [him] in the torso for no lawful reason." (*Id.* ¶ 18.)

The FAC does not allege that Officer Peters seized, detained, or shot Mr. Andrich. Instead, the primary allegation concerning Officer Peters is that he "had the ability and duty to intervene to prevent [Officer Kostas] from shooting [Mr. Andrich], but failed to intervene." (*Id.* ¶ 20.) The FAC further alleges that Officers Kostas and Peters both "failed to provide timely medical care" to Mr. Andrich, "failed to timely report the use of force/shooting to a supervisor," and "conspired with each other to fabricate facts and details in an effort to denigrate [Mr. Andrich] and put themselves in the best possible but false light." (*Id.* ¶¶ 23-25.)

Finally, with respect to the City, the FAC alleges that "for some time prior to June 12, 2018" it maintained, enforced, applied, ratified, directed, encouraged, and/or allowed various unconstitutional policies, including (1) a policy of employing police officers who the City "knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written Police Department policies," (2) a policy of "inadequately supervising, training, controlling, assigning, and disciplining Police Officers . . . who [the City] knew . . . had the aforementioned propensities and character traits," (3) a policy of "[f]ailing to use appropriate and general

[sic] accepted law enforcement procedures in handling individuals who are schizophrenic or have other mental disabilities," (4) a policy of "[i]gnoring or failing to properly and adequately investigate complaints or incidents of excessive and deadly force, unlawful seizures, and/or handling citizens who are schizophrenic or have other mental disabilities," (5) a policy of "[a]llowing, tolerating, and/or encouraging police officers to fail to file complete and accurate police reports, file false police reports, make false statements, intimidate, bias and/or coach witnesses to give false information and/or attempt to bolster officer's stories, and/or obstruct or interfere with investigations of unconstitutional or unlawful police conduct by withholding and/or concealing material information," (6) a policy of "maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling the intentional misconduct by [Officers Kostas and Peters]," and (7) a policy of "having and maintaining an unconstitutional custom and practice of unlawfully seizing citizens, using force and firearms, denying injured suspects immediate medical care, violating due process rights, and covering up police misconduct." (*Id.* ¶ 48.)

II. <u>The Claims</u>

The FAC asserts three federal and three state-law claims.

The federal claims are as follows. In Count One, Plaintiffs assert a claim against Officers Kostas and Peters pursuant to 42 U.S.C. § 1983. The theory underlying this claim is that Officers Kostas and Peters violated Mr. Andrich's right under the Fourteenth Amendment to be free from unreasonable searches and seizures and to be free from excessive force. (Doc. 18 ¶ 31.) In Count Two, Plaintiffs assert another § 1983 claim against Officers Kostas and Peters, this time alleging a violation of Mr. Andrich's right under the Fourteenth Amendment to receive medical care while in custody. (*Id.* ¶ 40.) And in Count Three, Plaintiffs assert a § 1983 claim against the City for "*Monell* liability." (*Id.* at 10.)

As for the state-law claims, Count Four is a claim against Officer Kostas and the City for "intentional battery" (*id.* ¶¶ 57-61), Count Five is a claim against Officer Kostas,

Officer Peters, and the City for "gross negligence" (*id.* ¶¶ 62-66), and Count Six is a claim against the City for "negligent hiring, supervision, or retention" (*id.* ¶¶ 67-70).

**ANALYSIS**

I. <u>Federal Claims</u>

Defendants move to dismiss the federal claims in the FAC for a host of different reasons. (Doc. 26 at 11-17.)

    A.    **Count One**

        1.    <u>Officer Kostas</u>

Defendants argue that Count One of the FAC—the § 1983 claim premised on allegations of an unlawful seizure and the use of excessive force—is deficient as to Officer Kostas because it "offer[s] no facts about the shooting other than the date, that it occurred, and that [Mr. Andrich] was allegedly schizophrenic. The remainder of the allegations are merely formulaic elements of claims and conclusions . . . . There are no facts about the time of day, why the police were responding, what the radio transmissions were to the police officers, where they encountered the decedent, what transpired before the shooting, or what exactly transpired at the moment of the shooting." (Doc. 26 at 12-14.) Thus, Defendants argue that Officer Kostas is entitled to qualified immunity. (*Id.*)

In their response, Plaintiffs argue that (1) Officer Kostas's invocation of qualified immunity is premature because it "has no place in a motion to dismiss a Fourth Amendment excessive force case" and (2) in any event, the FAC contains sufficient facts to survive a motion to dismiss because it alleges that Officer Kostas shot Mr. Andrich "for no lawful reason" as he "was turning away," even though Mr. Andrich was unarmed. (Doc. 27 at 9.)

Defendants' motion to dismiss Count One will be denied as to Officer Kostas. As an initial matter, the Court disagrees with Plaintiffs' contention that the defense of qualified immunity can never be raised at the motion-to-dismiss stage. Ninth Circuit law is to the contrary. *Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018) (acknowledging that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making" but clarifying that, despite those special problems, "a district court [may] dismiss[] a complaint for failure to state a claim based on a qualified

immunity defense . . . [if] the complaint [fails to] allege[] sufficient facts, taken as true, to support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware 'in light of the specific context of the case'") (citations omitted).

Nevertheless, on the merits, Officer Kostas is not entitled to qualified immunity at this preliminary stage of the proceedings. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted). Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, both prongs are satisfied. As for the second prong, the law has been clearly established for decades that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). And as for the first prong, the FAC alleges that Mr. Andrich had not engaged in any conduct that would create probable cause to arrest him, that he was "unarmed and never posed a threat to anyone," that he was "turning away" from Officer Kostas at the time of the shooting, and that Officer Kostas fired "[w]ithout any warning." (Doc. 18 ¶¶ 1, 19, 21, 22.) Taken as true, these allegations are sufficient to survive a motion to dismiss based on qualified immunity. *Keates*, 883 F.3d at 1235 (at the motion-to-dismiss phase in a qualified immunity case, "[i]f the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims") (citation and internal quotation marks omitted).

The Court wishes to emphasize that this determination "sheds little light on whether the government actors might ultimately be entitled to qualified immunity were the case permitted to proceed, at least to the summary judgment stage and the court is presented with facts providing context for the challenged actions." *Id*. (internal quotations omitted). Indeed, Defendants' motion correctly points out that the FAC fails to allege any facts addressing why the encounter occurred. Given further factual development, Officers Kostas very well may establish an entitlement to qualified immunity on Count One. But looking only to the facts alleged within the four corners of the FAC, he is not entitled to dismissal of Count I at this stage.

2. <u>Officer Peters</u>

Defendants contend that Officer Peters is entitled to qualified immunity on Count One because the FAC "conveniently leaves out facts related to Officer Peters, the non-shooting officer, while alleging a failure to intervene. These facts would include information related to Officer Peters' location at the time of the shooting (*i.e.* his proximity to Officer Kostas and the decedent) . . . . Officer Peters' physical ability to intervene and

whether he sustained any injuries that would have impacted his ability to intervene, or even to physically move his body to come within close proximity of the incident." (Doc. 26 at 14-15.) Defendants continue that "the lack of any facts makes it impossible to determine whether Plaintiffs have pled facts showing a violation of clearly established law." (*Id.*) Notably, Plaintiffs do not address these arguments in their response, apart from reiterating their (incorrect) view that qualified immunity can never be applied at the motion-to-dismiss stage. (Doc. 27 at 9.)

The motion to dismiss Count One will be granted as to Officer Peters. The FAC is devoid of any facts suggesting that Officer Peters could have intervened and stopped Officer Kostas from shooting Mr. Andrich. To the contrary, the FAC makes it appear the shooting was a split-second decision by Officer Kostas. In any event, it was Plaintiffs' burden to establish "that the right allegedly violated was clearly established at the time of the alleged misconduct, *Romero,* 931 F.2d at 627, and Plaintiffs have not identified any cases upholding failure-to-intervene liability against police officers when the possibility of intervention wasn't established. *Cf. Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (finding non-shooting federal agents not liable in a § 1983 suit where they were "physically incapable of preventing the incidents surrounding the shooting").

B. **Count Two**

Defendants seeks dismissal of Count Two of the FAC—the § 1983 claim against Officers Kostas and Peters premised on an alleged failure to provide medical care— because "[t]he only 'facts' are that [Mr. Andrich] was shot. There are no facts about whether the paramedics were summoned, or even whether [Mr. Andrich] died immediately after being shot." (Doc. 26 at 16-17.) In their response, Plaintiffs criticize Defendants for focusing on subjective intent rather than objective reasonableness but don't meaningfully address Defendants' argument concerning the absence of facts supporting Count II. (Doc. 27 at 10-11.)

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

Count Two fails under *Iqbal*. Although the FAC asserts in conclusory fashion that Officers Kostas and Peters "failed to provide timely medical care" and "deprived [Mr. Andrich] of his right to receive medical care, treatment, and monitoring while seized or in custody" (Doc. 18 ¶¶ 23, 39), there are no *facts* supporting those labels. Accordingly, Count Two will be dismissed as to both Officer Kostas and Officer Peters.

C. **Count Three**

Defendants seek dismissal of Count Three of the FAC—the § 1983 claim against the City premised on "*Monell* liability"[1]—because it "rests upon no facts, but instead mere kitchen-sink conclusions. In fact, it appears that Plaintiffs have thrown in every word they believe could be used in the context of a *Monell* claim, rather than focusing on specific claims tied to alleged facts." (Doc. 26 at 15-16.) Plaintiffs respond that they have properly asserted a *Monell* claim because the FAC alleges the City "had several policies of employing police officers with dangerous propensities, of inadequately supervising its employees, of failing to use generally accepted law enforcement procedures, and of failing to properly investigate complaints of excessive and deadly force, amongst others." (Doc. 27 at 10.)

---

[1] "A municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Rather, a municipality can be liable under § 1983 when "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690.

This marks another instance where the FAC fails under *Iqbal*. For example, although the FAC asserts that the City "knew or reasonably should have known [that Officers Kostas and Peters] had dangerous propensities for abusing their authority and for mistreating citizens" (Doc. 18 ¶ 48(a)), the FAC does not allege any facts that might support this conclusion. This is a textbook example of the sort of conclusory, fact-free assertion that *Iqbal* forbids. The allegations in paragraphs 48(b)-(g) of the FAC fail for the same reason—they are labels and conclusions unsupported by facts.

Similarly, although the FAC purports to advance a ratification theory by asserting that unnamed "policy makers" approved the "unconstitutional display of unreasonable, excessive and deadly force" and "made a deliberate choice to endorse the . . . killing of [Mr. Andrich] and the basis for that killing" (Doc. 18 ¶ 51), the FAC is conspicuously devoid of any facts showing who those policymakers were, how they approved and endorsed the challenged conduct, and when and where the endorsement occurred.

For these reasons, Count Three of the FAC will be dismissed.[2]

II. State-Law Claims

As discussed above, Plaintiffs have asserted one viable federal cause of action: the excessive force claim under § 1983 against Officer Kostas in Count One. Thus, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 to consider the state-law claims brought by Plaintiffs.

Defendants identify a variety of reasons why some or all of these state-law claims should be dismissed. (Doc. 6 at 3-11.) Those arguments are addressed below.

A. **Notice Of Claim**

Defendants seek dismissal of the state-law claims because Plaintiffs allegedly failed, in various ways, to comply with Arizona's notice of claim ("NOC") statute, which provides that parties with claims against a public entity or employee "shall file claims with the person or persons authorized to accept service . . . as set forth in the Arizona rules of civil

---

[2] Defendants also move to dismiss (1) any claim for familial damages under Counts One, Two, and Three and (2) any claim for civil conspiracy. (Doc. 26 at 10-11.) However, Plaintiffs clarify in their response that although such claims may have appeared in an earlier iteration of their complaint, they are not being asserted in the FAC. (Doc. 27 at 1-2 n.1.)

- 9 -

procedure within one hundred eighty days after the cause of action accrues." A.R.S. § 12-821.01(A). The NOC "shall contain facts sufficient . . . to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount." *Id.* "If a notice of claim is not properly filed within the statutory time limit, a plaintiff's claim is barred by statute." *Falcon ex rel. Sandoval v. Maricopa Cty.*, 144 P.3d 1254, 1256 (Ariz. 2006). Additionally, "[a]ctual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12-821.01(A)." *Id.*

First, Defendants seek dismissal of all of the state-law claims asserted by the Estate because the Estate never filed an NOC. (Doc. 26 at 3 ["There was no NOC that was submitted separately by the Estate."]; *id.* at 6 [same].) Plaintiffs respond that this contention is "simply not true" because Louise Andrich, "the personal representative of the Estate . . . did file a notice of claim that was rejected by operation of law." (Doc. 27 at 12.) Defendants reply that Ms. Andrich's NOC was inadequate because it was submitted "on her own behalf," not on behalf of the Estate. (Doc. 28 at 4.)

The Court agrees with Defendants that the NOC submitted by Ms. Andrich was insufficient to preserve any claims being pursued by the Estate. Ms. Andrich's NOC identified her as a "relative of deceased," not as the Estate's personal representative. (Doc. 26-1 at 2.)[3] Moreover, the NOC was submitted on November 17, 2018 (Doc. 26-1 at 5), yet Ms. Andrich has submitted a declaration stating that she wasn't even appointed as the personal representative of the Estate until some point in 2019, when a probate case was initiated in California state court (Doc 18 at 18 ¶¶ 3-4). An NOC submitted months before

---

[3] Although the FAC refers to the NOCs (Doc. 18 ¶ 15), they were not included as attachments to the FAC. Accordingly, Defendants provided them as exhibits to the motion to dismiss (Doc. 26-1), and Plaintiffs don't dispute their accuracy (Doc. 27 at 3 [only objecting to a different exhibit]). Under these circumstances, the Court may consider the contents of the NOCs without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials [including] documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment.").

that appointment obviously couldn't have placed the recipients on notice that Ms. Andrich was also seeking damages on the Estate's behalf.[4]

Second, Plaintiffs seek dismissal of all of the state-law claims asserted against Officers Kostas and Peters because they were not individually served with the NOCs—instead, Plaintiffs submitted those NOCs to the City Clerk of Phoenix, which was not an authorized agent. (Doc. 26 at 7-9.) Plaintiffs respond that their service efforts on Officers Kostas and Peters were sufficient because (1) under *Lee v. State*, 182 P.3d 1169 (Ariz. 2008), "a claim form delivered by mail is presumed received and satisfies the notice requirement under A.R.S. § 12-821.01," and (2) the NOC forms provided by the City expressly require service on the City Clerk and don't mention anything about personal service on individual defendants. (Doc. 27 at 8-9.) In their reply, Defendants argue that *Lee* is inapposite because it "did not address with whom the notice was filed" and that the City's "provision of a form for claims against it [cannot] somehow be extended to support the notion that it accepts service for all claims against employees who are not served." (Doc. 28 at 2-3.)

Defendants have the better side of this argument. Many Arizona courts have recognized that a party seeking to sue a government employee must personally serve the employee with the NOC—service upon the City Clerk, or the receptionist at the office where the government employee happens to work, is insufficient. *See generally Udd v. City of Phoenix*, 2018 WL 6727267, *4-7 (D. Ariz. 2018) (canvassing cases). Also, Plaintiffs' reliance on *Lee* is misplaced because there's been no suggestion (let alone evidence) that they mailed their NOCs to the home addresses of Officer Kostas or Officer Peters. Regardless of whether the NOCs pertaining to Officers Kostas and Peters were sent to the City Clerk by mail or in person, the transmission was ineffective because it went to the wrong recipient.

---

[4] This conclusion makes it unnecessary to resolve Defendants' alternative argument that, because Mr. Andrich has a surviving beneficiary (his mother), the Estate lacks standing to assert a claim on his behalf. (Doc. 26 at 6.)

- 11 -

Given these conclusions, the only potential remaining state-law claims are the claims of the three individual Plaintiffs (Louse Andrich, AL.A., and AM.A.) against one of the Defendants (the City). As to those claims, Defendants contend the NOCs were substantively deficient because (1) the NOCs contain no facts supporting each individual Plaintiff's request for $200 million in damages, (2) a decedent's siblings are ineligible to assert a wrongful death claim under Arizona law and the NOCs did not expressly state (or assert any facts supporting the legal conclusion) that the siblings' claims should be governed by California law, (3) the NOCs contain no facts that would support liability under Count Six, the negligent hiring/supervision/retention claim, and (4) the NOCs contain no facts that would support holding the City liable on a *respondeat superior* basis for the conduct of Officers Kostas and Peters in light of *Ryan v. Napier*, 425 P.3d 230 (Ariz. 2018). (Doc. 26 at 9-10.) In response, Plaintiffs contend that an NOC "may not be deemed invalid . . . merely because all facts about the alleged wrong are not provided or because the amount demanded is not objectively quantifiable." (Doc. 27 at 12-13, citing *Havasupai Tribe of Havasupai Reservation v. Ariz. Bd. of Regents*, 204 P.3d 1063 (Ariz. Ct. App. 2008), and *Backus v. State*, 203 P.3d 499 (Ariz. 2009).) In their reply, Defendants do not specifically address these cases but repeat their contention that "[t]he law" requires an NOC to contain a sufficiently detailed recitation of the facts supporting the claims for liability and damages. (Doc. 28 at 3-4.)

Defendants' arguments are unavailing. As noted, A.R.S. § 12-821.01(A) provides that an NOC must contain (1) "facts sufficient . . . to understand the basis on which liability is claimed," (2) "a specific amount for which the claim can be settled," and (3) "the facts supporting that amount." Here, each individual Plaintiff's NOC to the City contained all three categories of information. First, each NOC alleged at least some facts that would permit the City to understand the basis on which liability was claimed. (Doc. 26-1 at 3, 7, 15 [alleging, in response to question on this topic, that "Officer Gus Kostas unlawfully shot and killed Alexandre Andrich when Mr. Andrich was not posing a threat to anyone or any officer's safety" and that "[t]he City of Phoenix is negligent by failing to train its officers on the proper use of firearms when encountering individuals"].) Second, each

NOC included a specific, sum-certain amount of damages the claimant would be willing to accept to settle the claim. (*Id.* at 4, 8, 16 ["Total dollar amount requested to settle your entire claim: $200,000,000.00."].) And third, each NOC provided at least some facts supporting this damage claim, by noting the claimant's familial relationship with Mr. Andrich. (*Id.* at 2, 6, 14 [identifying each claimant as "relative of deceased"].)

To be sure, the NOCs could have contained more facts concerning the factual foundation for each claim, particularly in light of the astronomical amount of damages being sought. Nevertheless, the Arizona Supreme Court has emphasized that "as long as a claimant provides facts to support the amount claimed, he has complied with the supporting-facts requirement of the statute, and courts should not scrutinize the claimant's description of facts to determine the 'sufficiency' of the factual disclosure." *Backus v. State*, 203 P.3d 499, 505 (Ariz. 2009). Defendants fail to address *Backus* in their moving papers and do not identify a single case in which an Arizona court rejected an NOC based on a determination that the proffered facts were too vague. At bottom, Defendants appear to be asking the Court to review the NOCs under Rule 12(b)(6)-like standards and *Iqbal*, but that type of scrutiny is not required under Arizona law. Accordingly, the individual Plaintiffs' claims against the City will not be dismissed based on alleged non-compliance with A.R.S. § 12-821.01(A).

### B. Standing Of Siblings To Pursue Wrongful Death Claims

On the merits, Defendants seek dismissal of the individual Plaintiffs' state-law claims because "Counts Five, Six, and Seven[] are wrongful death claims asserted by the decedent's siblings," yet "Arizona wrongful death law does not afford siblings recovery." (Doc. 26 at 3-5.)

As an initial matter, it appears this argument is directed to an earlier, now-obsolete iteration of the complaint. In the original version of the complaint, Plaintiffs asserted four federal claims and three state-law claims, with the state-law claims numbered as Counts Five, Six, and Seven. (Doc. 1.) The FAC, in contrast, asserts three federal claims, so the state-law claims are now numbered Counts Four, Five, and Six. (Doc. 18.) Thus, the Court

assumes Defendants' dismissal argument is actually directed toward Counts Four, Five, and Six of the FAC.

The Court also notes that the original complaint and FAC use slightly different verbiage to describe the state-law claims. In the original complaint, the first two state-law claims (Counts Five and Six) were both characterized as claims for "wrongful death." (Doc. 1 at 1, 15, 16.) In contrast, the FAC characterizes the first state-law claim (now Count Four) as a "survival" claim, while continuing to characterize the second state-law claim (now Count Five) as a "wrongful death" claim. (Doc. 18 at 13,14.)

It is unclear whether this change in nomenclature was a deliberate one. If not, and Plaintiffs were simply using the terms interchangeably, this was a mistake. "A wrongful death claim and a survival claim are separate claims arising from the same incident." *Gandy v. United States*, 437 F. Supp. 2d 1085, 1086 (D. Ariz. 2006). *See also Barragan v. Superior Court of Pima Cty.*, 470 P.2d 722, 724 (Ariz. Ct. App. 1970) ("A wrongful death action is an original and distinct claim for damages sustained by the statutory beneficiaries and is not derivative of or a continuation of a claim existing in the decedent."). Survival claims are authorized and governed by A.R.S. § 14-3110. Notably, "[u]nder Arizona law, a claim under the survival statute may be brought only by a decedent's estate." *Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 883 (D. Ariz. 2008). *See also Quintero v. Rogers*, 212 P.3d 874, 877 (Ariz. Ct. App. 2009) (the survival statute "extended the right of a decedent's personal representative to pursue the decedent's personal injury claim against a tortfeasor"). Meanwhile, wrongful death claims are authorized and governed by A.R.S. § 12-611. Additionally, Arizona law limits who may assert a wrongful death claim: "An action for wrongful death shall be brought by and in the name of the surviving husband or wife, child, parent or guardian, or personal representative of the deceased person for and on behalf of the surviving husband or wife, children or parents, or if none of these survive, on behalf of the decedent's estate." A.R.S. § 12-612(A).

With this backdrop in mind, it is clear that, to the extent Arizona law governs the individual Plaintiffs' state-law claims, those claims must be dismissed—under Arizona law, survival claims may only be asserted by the estate, not the decedent's siblings (*see*

A.R.S. § 14-3110) and wrongful death claims may only be asserted by a limited group of individuals that does not include siblings (*see* A.R.S. §§ 12-612(A)). In their response, Plaintiffs acknowledge the existence of these limitations on sibling recovery under Arizona law[5] but argue the Court should apply California law, which allows siblings to assert wrongful death claims. (Doc. 27 at 4-7.) Defendants reply that the choice-of-law analysis should be resolved in favor of applying Arizona law. (Doc. 28 at 7-8.)

The Court agrees with Defendants that the state-law claims in this case are governed by Arizona law. As a threshold matter, all parties agree that the Court must apply Arizona's choice-of-law rule when resolving this issue[6] and that Arizona follows the Restatement (Second) of Conflict of Laws. (Doc. 26 at 4; Doc. 27 at 3-5.) The relevant provision within the Restatement is Section 175. *See generally Bryant v. Silverman*, 703 P.2d 1190, 1191-92 (Ariz. 1985) ("[T]his Court has adopted the rules embodied in the Restatement (Second) of Conflicts (1971) to analyze and solve conflicts problems arising in Arizona. . . . Restatement § 178 points to § 175 for the principles in determining conflict issues in wrongful death cases . . . .").

Section 175 provides that "[i]n an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship . . . ." When evaluating which state has the most significant relationship, courts must consider the following four factors (which are set forth in Section 145): (1) "the place where the injury occurred," (2)" the place where the conduct causing the injury occurred, (3) "the domicil, residence, nationality, place of incorporation and place of business of the parties,"

---

[5] It should be noted that Plaintiffs appear to believe no conflict-of-law analysis is required as to Louise Andrich because she was appointed to serve as the personal representative of the Estate. (Doc. 27 at 4.) This argument overlooks that the claims asserted by the Estate (which have been dismissed based on non-compliance with Arizona's notice-of-claim statute) must be analyzed separately from the claims asserted by Louise Andrich in her individual capacity as a sibling.

[6] *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law.").

and (4) "the place where the relationship, if any, between the parties is centered." *Bryant*, 703 P.2d at 1193 (citing Restatement (Second) Conflict of Laws § 145).

Here, the parties agree that the first and second factors favor application of Arizona law. (Doc. 26 at 4; Doc. 27 at 5.) The third factor is mixed: although Mr. Andrich and all of his siblings hail from California, the City is obviously located in Arizona. Finally, the fourth factor is inapplicable because it only applies "when the injury was caused by an act done in the course of [a] relationship." *Pounders v. Enserch E & C, Inc.*, 306 P.3d 9, 14 (Ariz. 2013). The FAC does not allege a preexisting relationship between Mr. Andrich and the City or between any of the individual Plaintiffs and the City.

Taking these factors into qualitative account,[7] Arizona has a much more significant relationship than California. At bottom, Plaintiffs seek to hold an Arizona-based municipality liable for a death that occurred in Arizona as the alleged result of policies the municipality utilized when training, supervising, and employing its Arizona-based law enforcement officers. The only connection to California is that Mr. Andrich and his siblings happened to reside there. *Compare Pounders,* 306 P.3d at 14-15 (applying New Mexico law, even though injury occurred in Arizona, where the liability-generating conduct took place in New Mexico and "the injury's occurrence in Arizona is fortuitous"); *Bryant*, 703 P.2d at 1193-94 (applying Arizona law, even though the injury took place in Colorado, because "in airplane crash cases the place of injury is much more fortuitous than the place defendant selects as his place of incorporation and principal place of business or the place of misconduct").

Nor does California have a more significant relationship based on the factors identified in Section 6 of the Restatement. Neither party expressly addressed those factors in their briefs, focusing instead on the factors in Sections 145 and 175. (Doc. 26, Doc. 27). The Section 6 factors are "basic policy considerations that apply in every choice of law case," including the "policies of the forum," "the policies of other interested states," "the

---

[7] *Bryant*, 703 P.2d at 1194 ("The determination of which state has the most significant contacts . . . is primarily qualitative and not quantitative. We must determine, therefore, the weight to be given each contact in light of the issues and facts of this case.").

protection of justified expectations," "the basic policies underlying the particular field of law," and the "certainty, predictability, and uniformity of result." *Pounders*, 306 P.3d at 15. Here, although California certainly has an interest in affording recovery to its citizens who have suffered injuries, the City could have reasonably expected that Arizona law would apply in this circumstance. Every state (including Arizona and California) has an interest in allowing its municipalities to structure their expectations in accord with local law rather than the law of 49 other states. *Cf. Nuñag-Tanedo v. East Baton Rouge Parish Sch. Bd.*, 2011 WL 13153190, *12 (C.D. Cal. 2011) ("Louisiana, not California, has a strong interest in determining when its own public entities may be liable.").

For these reasons, Arizona law governs the individual Plaintiffs' state-law claims against the City in Counts Four, Five, and Six. Because the individual Plaintiffs lack standing under Arizona law to assert such claims, dismissal is warranted.

III. <u>Leave to Amend</u>

Plaintiffs include a request to amend the FAC to cure any deficiencies identified by the Court. (Doc. 26 at 12.) Defendants oppose this request, arguing: "Plaintiffs have amended once. It should not take Defendants filing of a Motion to Dismiss to accomplish amendment. Repeating this cycle again is wasteful." (Doc. 26 at 17.)

"Rule 15 advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, the Court shouldn't deny leave to amend unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, amendment would be futile for all of Plaintiffs' state-law claims—the reasons they are being dismissed (failure to comply with the NOC rules and lack of standing) can't be cured through the presence of additional factual allegations. In contrast, it's possible Plaintiffs could resuscitate their claim against Officer Peters in Count One, as well as their claims in Counts Two and Three, by asserting more facts. Accordingly, leave to amend will be granted as to Counts One, Two, and Three but denied as to Counts Four, Five, and

- 17 -

Six of the FAC.

Accordingly, **IT IS ORDERED** that:

(1) The motion to dismiss (Doc. 26) is **granted in part and denied in part**; and

(2) Plaintiffs may file a second amended complaint, in compliance with Local Rule 15.1(b) and consistent with this order, within 14 days of the date on which this Order was issued.

Dated this 23rd day of January, 2020.

Dominic W. Lanza
United States District Judge