1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Louise Andrich, et al.,                    No. CV-19-02212-PHX-DWL

10                    Plaintiffs,               **ORDER**

11  v.

12  Gus Kostas, et al.,

13                    Defendants.

14

15          This lawsuit arises from the fatal shooting of Alexandre Andrich by Phoenix Police

16  Department ("PPD") Officer Gus Kostas.  (Doc. 31 ¶ 1.)  The plaintiffs are Louise Andrich,

17  who is suing both in her individual capacity as Mr. Andrich's sister and as the administrator

18  of Mr. Andrich's estate, and Mr. Andrich's minor siblings AL.A. and AM.A. (collectively,

19  "Plaintiffs").  (*Id.* ¶¶ 4-5.)  The defendants are Officer Kostas, fellow PPD Officer Brian

20  Peters, and the City of Phoenix ("the City") (collectively, "Defendants").

21          Now pending before the Court is Defendants' motion to dismiss Plaintiffs' Second

22  Amended Complaint ("SAC").  For the following reasons, the motion will be granted in

23  part and denied in part.

24                                **BACKGROUND**

25  I.     Factual Background

26          The facts alleged in the SAC are as follows.  Officers Kostas and Peters "contacted"

27  Mr. Andrich—for reasons not specified in the SAC—on the morning of June 12, 2018 at

28  First Avenue and Osborne Road in Phoenix.  (Doc. 31 ¶ 20.)  Officers Kostas and Peters

allegedly had "no probable cause, reasonable suspicion, or lawful reason to seize or detain [Mr. Andrich]." (*Id.*) Mr. Andrich "was unarmed and never posed a threat to anyone" and also "suffered from a mental disability of schizophrenia which was readily apparent." (*Id.*)

Officers Peters and Kostas "both attempted to detain and/or seize" Mr. Andrich by "physically restrain[ing him] with their hands and force." (*Id.*) Officers Kostas and Peters "then began using hand and fist strikes against" Mr. Andrich and "each deployed their Tasers at [Mr. Andrich] when such force was not need[ed]." (*Id.*) Then, as Mr. Andrich was "turning away" and "in a non-aggressive manner began walking away," Officer Kostas "fatally shot [Mr. Andrich] in the torso for no lawful reason." (*Id.*)

The SAC further alleges that Officer Peters "had the opportunity to deescalate the situation and avoid all force" but "failed to do so" and also "failed to intervene to prevent the fatal shooting" despite the "ability and duty" to do so. (*Id.* ¶¶ 20-21.) After the shooting, "[t]wenty-nine minutes passed . . . before [Officers Kostas and Peters] timely reported the use of force and summoned medical care for [Mr. Andrich's] fatal gunshot wound." (*Id.* ¶ 24.) The SAC alleges that "[h]ad proper life saving measures been applied, [Mr. Andrich's] death could have been avoided." (*Id.*) Moreover, the SAC alleges that Officers Kostas and Peters "conspired with each other to fabricate facts and details in an effort to denigrate [Mr. Andrich] and put themselves in the best possible but false light." (*Id.* ¶ 26.)

Concerning the City, the SAC alleges that it "knowingly maintained, enforced, and applied in an official recognized custom, policy, and practice of, or in the alternative, ratified, directed, encouraged and/or allowed the following": (1) the City "knew" that Officers Kostas and Peters "had in the past . . . committed similar acts of unlawful use of force, falsifying reports, suppressing evidence, dishonesty and abuse" which both "enabl[ed] [Officers Kostas and Peters] to . . . violate the constitutional rights of" Mr. Andrich and was met with "refus[al] to enforce established administrative procedures to insure the rights of detainees"; (2) the City "refused to adequately discipline individual officers and employees found to have committed similar acts of abuse and misconduct";

(3) the City "refused to competently and impartially investigate allegations of unlawful force, abuse and misconduct" by PPD employees; (4) the City "sanctioned a code of silence" among leadership and officers concerning acts of misconduct and "reprimanded, threatened, intimidated, demoted and fired officers who courageously reported unlawful acts by other officers"; (5) the City "knew of and sanctioned the practice of unlawful discharge of firearms and fatal officer involved shootings"; (6) the City "failed to adequately supervise the actions of officers under [its] control and guidance"; (7) the City "failed to provide adequate training to officers on how to respond to . . . citizens with schizophrenia"; and (8) the City "fostered and encouraged an atmosphere of lawlessness, abuse and misconduct" within PPD.  (*Id*. ¶ 53.)   The SAC further alleges that City policymakers had "direct knowledge of the fact that [Mr. Andrich's] death was not justified, but rather represented an unconstitutional display of force" and nevertheless "made a deliberate decision to endorse the . . . killing . . . and the basis for that killing."  (*Id*. ¶ 56.)

II.   Procedural Background

On April 4, 2019, Plaintiffs filed a complaint.  (Doc. 1.)

On June 10, 2019, Defendants filed a motion to dismiss.  (Doc. 17.)

On June 24, 2019, Plaintiffs filed their First Amended Complaint ("FAC").  (Doc. 18.)  The FAC asserted three federal causes of action (§ 1983 claims for excessive force and failure to intervene, denial of medical care, and *Monell* liability) and three state-law causes of action.  (*Id*.)

On June 27, 2019, Defendants withdrew their original motion to dismiss.  (Doc. 24.)

On July 8, 2019, Defendants filed a motion to dismiss the FAC.  (Doc. 26.)

On January 23, 2019, the Court issued an order granting in part and denying in part the motion to dismiss.  (Doc. 29.)  In that order, the Court denied the motion to dismiss the § 1983 excessive force claim against Officer Kostas but granted the motion to dismiss Plaintiffs' other § 1983 claims.  (*Id*. at 4-9.)  The Court also granted the motion to dismiss all state-law claims against Officers Kostas and Peters due to Plaintiffs' failure to comply

with Arizona's notice of claims statute.  (*Id*. at 9-13.)  Finally, the Court, after concluding that Arizona law and not California law governed the state-law claims, granted the motion to dismiss the individual plaintiffs' state-law claims because Arizona law did not afford them standing.  (*Id*. at 13-17.)  The Court granted Plaintiffs' request to amend the FAC as to the federal claims but concluded that amendment of the dismissed state-law claims would be futile.  (*Id*. at 17-18.)

On January 31, 2020, Plaintiffs filed their SAC.  (Doc. 31.)  The SAC asserts the same three federal claims as the FAC and does not contain any state-law claims.  (*Id*.)

On February 14, 2020, Defendants filed a motion to dismiss the SAC.  (Doc. 33.)

On February 28, 2020, Plaintiffs filed a response.  (Doc. 34.)

On March 6, 2020, Defendants filed a reply.  (Doc. 35.)

**DISCUSSION**

I.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id*. at 1144-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 679-80.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.  Applicability Of A.R.S. § 14-3110's Prohibition Against Recovery Of Damages For Pre-Death Pain And Suffering In An Action Under 42 U.S.C. § 1983

In Count I of the SAC, Plaintiffs assert a § 1983 claim against Officers Kostas and Peters for violating the Fourteenth Amendment's prohibitions against unreasonable

- 4 -

1    searches and seizures and excessive force.  (Doc. 31 ¶ 33.)  As part of this claim, Plaintiffs

2    seek to recover various categories of damages, including damages arising from Mr.

3    Andrich's "pre-death pain and suffering."  (*Id.* ¶ 38.)

4         Officers Kostas and Peters seek the dismissal of this category of damages.  (Doc. 33

5    at 3-4.)  They contend that, although the FAC only sought to hold them liable for the alleged

6    excessive force that caused Mr. Andrich's death, the SAC now includes additional

7    allegations of excessive force that preceded the gunshot, including fist strikes and taser use.

8    (*Id.*)  They argue that such claims are foreclosed by Arizona's survival statute, A.R.S. §

9    14-3110, which precludes an estate from seeking recovery for the decedent's pre-death

10   pain and suffering.  (*Id.*)[1]  In response, Plaintiffs acknowledge that A.R.S. § 14-3110

11   "abates recovery of pain and suffering damages for all survival actions" but argue that it

12   cannot be applied here because it is inconsistent with § 1983's policies of compensation

13   and deterrence.  (Doc. 34 at 6-9.)

14        Section 1983 does "not address directly the question of damages."  *Carey v. Piphus*,

15   435 U.S. 247, 255 (1978).  Thus, courts must apply "state-law survival remedies in § 1983

16   actions unless those remedies are inconsistent with the Constitution and laws of the United

17   States."  *Jefferson v. City of Tarrant, Ala.*, 522 U.S. 75, 79 (1997) (citation and internal

18   quotation marks omitted).

19        In *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014), the Ninth Circuit

20   applied these principles when addressing a question that is related to, but distinct from, the

21   question presented here.  There, an autistic man was shot and killed during an encounter

22   with police officers.  *Id.* at 1100.  Although the officer testified that the shots were fired in

23   self-defense, after the decedent lunged at him with a knife, the decedent's estate presented

24   evidence at trial suggesting that the decedent never handled the knife and that the shots

25

26   [1]      Specifically, A.R.S. § 14-3110 provides: "Every cause of action, except a cause of
     action for damages for breach of promise to marry, seduction, libel, slander, separate
27   maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive
     the death of the person entitled thereto or liable therefor, and may be asserted by or against
28   the personal representative of such person, *provided that upon the death of the person
     injured, damages for pain and suffering of such injured person shall not be allowed*."  *Id.*
     (emphasis added).

were fired as the decedent was "collapsing to the ground, rather than he was advancing toward" the officer. *Id.* at 1100, 1102. The jury accepted the estate's version of the incident and awarded, among other things, $1 million in damages for the decedent's pain and suffering. *Id.* at 1102. However, the district court struck the $1 million award on the ground that California law (like Arizona law) "does not allow a decedent's estate to recover for the decedent's pre-death pain and suffering." *Id.* at 1103 (citing Cal. Code Civ. P. § 377.34). The Ninth Circuit reversed, holding that this state-law limitation was "inconsistent with § 1983's goals of compensation and deterrence" because "the victims of excessive police force are often low-paid or unemployed," so "a prohibition against pre-death pain and suffering awards for a decedent's estate has the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." *Id.* at 1103-05. Thus, the court concluded that California's statutory limitation on recovery "does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law." *Id.* at 1105. Critically, the court clarified that it was not deciding whether the same outcome would be required in a case where the decedent's death was not caused by the violation of federal law. *Id.* at 1104 ("[T]he distinction between those violations of federal law that cause death and those that do not is crucial.").

This case raises the issue that *Chaudhry* refrained from deciding. Plaintiffs seek to recover pain-and-suffering damages arising from alleged violations of federal law that did not cause Mr. Andrich's death—specifically, the fist strikes and taser use by Officers Kostas and Peters that preceded the fatal gunshot by Officer Kostas. The parties acknowledge there are no published Ninth Circuit decisions addressing this issue and thus point to various unpublished decisions, and decisions from other Circuits, in support of their respective positions.

According to Defendants, the key case is *Fernandez v. Virgillo*, 2014 WL 2930749 (D. Ariz. 2014). There, the estate of a man shot and killed by a police officer sought to recover, from the other officer present at the scene, damages arising from the pre-death pain and suffering that the decedent experienced due to that officer's use of a taser. *Id.* at

*1, *4. The district court rejected this claim, holding that it was precluded by A.R.S. § 14-3110 and that applying this state-law limitation on recovery would not be "inconsistent with § 1983's . . . compensation-related goal because survival actions are not brought by injured parties themselves, but rather by the executors of their estates" and "[i]f the action did not cause the decedent's death . . . abating pain and suffering damages would not hinder § 1983's prevention goal because the official would have had no way of knowing in advance that the decedent would die before he could bring a § 1983 suit." *Id.* at *4. In reaching these conclusions, the district court relied heavily on the Supreme Court's decision in *Robertson v. Wegmann*, 436 U.S. 584 (1978). *Id.* at *4-5. In an unpublished decision, the Ninth Circuit affirmed, holding that "[t]he district court correctly held that . . . applying Arizona's law does not frustrate the purposes of § 1983 where, as here, the alleged constitutional violation did not cause the victim's death." *Fernandez v. Virgillo*, 651 Fed. App'x 692, 693 (9th Cir. 2016). In support of this conclusion, the Ninth Circuit also cited *Robertson*. *Id.*[2]

Meanwhile, Plaintiffs urge the Court to follow *Erickson v. Camarillo*, 2017 WL 2335659 (D. Ariz. 2017). In *Erickson*, the defendant officer "secured a hold around [Decedent's] neck" in an attempt to restrain him, and after five minutes of struggle, "officers carried Decedent down a stairway to EMS personnel, who determined that Decedent was pulseless." *Id.* at *1. During the ensuing § 1983 action, the officer argued that his use of force didn't cause the decedent's death, which was instead the result of methamphetamine-induced delirium. *Id.* As part of this defense, the officer also requested a jury instruction, based on A.R.S. § 14-3110, that pain and suffering damages were available only if the jury found that his use of force caused the decedent's death. *Id.* at *2. The district court rejected the officer's proposed instruction, holding that applying A.R.S. § 14-3110 in this fashion would undermine § 1983's goal of compensation (because "where

---

[2]    The Ninth Circuit also identified an alternative rationale for affirming the district court's rejection of the claim against the officer who deployed the taser—the officer was "entitled to qualified immunity because it was not clearly established on October 5, 2010, that [the officer's] use of his taser was excessive in the circumstances." *Fernandez*, 651 Fed. App'x at 693.

a defendant's action contributes but does not legally cause a decedent's death, a survival action provides the only adequate means of compensation") and would also undermine § 1983's goal of deterrence (because it would, *inter alia*, create a potential "windfall to the individual accused of engaging in unlawful conduct" should the victim die). *Id.* at *5-7 (citations and brackets omitted). Finally, the court expressed disagreement with *Fernandez*, concluding that the decision in that case was based on an unnecessarily broad reading of *Robertson*. *Id.* at *5 ("[T]his Court disagrees with . . . *Fernandez*'s broad characterization of *Robertson*'s 'narrow' holding.").

Plaintiffs have the better side of this argument. Applying A.R.S. § 14-3110 to preclude recovery for the fist strikes and taser use that preceded Mr. Andrich's death would be inconsistent with the goals underlying 42 U.S.C. § 1983.[3] In particular, precluding recovery in this circumstance would undermine § 1983's goal of promoting deterrence. The Supreme Court has emphasized that "[a]ny analysis of the purposes and scope of § 1983 must take cognizance of the events and passions of the time at which it was enacted." *District of Columbia v. Carter*, 409 U.S. 418, 425 (1973). Section 1983 was enacted in 1871, in the aftermath of the Civil War, and "it seems clear that [§ 1983] was designed primarily in response to the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." *Id.* at 426. Put another way, § 1983 constituted "a means to provide at least indirect federal control over the unconstitutional actions of state officials." *Id.* at 428. Thus, it is well settled that one of the key objectives of § 1983 is to deter state officials, via the threat of money damages, from deploying excessive force against—and therefore violating the constitutional rights of—individuals. *See, e.g., Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1052 (9th Cir. 2018) ("The policies underlying § 1983 include . . . prevention of abuses of power by those acting under color of state law.") (quotation omitted); *United States v. Alexander*, 540 F.3d 494, 504 (6th Cir. 2008) ("[T]he availability of a § 1983 action against the officer, although

---

[3]     To be clear, the Court expresses no judgment as to whether the alleged fist strikes and taser use by Officers Kostas and Peters qualify as excessive force in violation of the Fourteenth Amendment. Rather, the Court simply assumes, for purposes of analyzing the applicability of A.R.S. § 14-3110 at the pleading stage of this case, that they so qualify.

designed primarily to compensate for injury, also functions to deter police misconduct."); *Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) ("[S]ection 1983 claims advance societal interests because the vindication of their constitutional rights helps provide an important check on public officials and presumably deters a range of official misconduct, such as the use of excessive force . . . .").

It would undermine this objective to allow a police officer who used excessive force to escape liability for his conduct simply because a different officer subsequently engaged in a separate act that caused the victim's death.  As the court correctly recognized in *Erickson*, "[a]llowing a mere fortuity for the defendant to produce a significant windfall runs contrary to § 1983's policy goal of deterring unlawful conduct."  2017 WL 2335659 at *7.  *See generally* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice 199, 201 (2013) ("[T]he deterrent effect of . . . the certainty of punishment is far more convincing and consistent [than the deterrent effect of] the severity of punishment.").

Finally, the Court respectfully disagrees with the *Fernandez* courts' suggestion that *Robertson* compels a different conclusion.  In *Robertson*, a Louisiana man (Shaw) brought a § 1983 action against the district attorney and others for malicious prosecution—specifically, for instituting perjury charges against him after he was acquitted in a different criminal trial.  436 U.S. at 586 & n.2.  After four years of pre-trial litigation in the § 1983 action, Shaw died.  *Id.* at 585.  Under Louisiana law, only a decedent's spouse, children, parents, and siblings had standing to continue litigating the decedent's claim in this circumstance, and Shaw did not have any relatives who fell into those categories.  *Id.* at 587.  Thus, the question presented in *Robertson* was whether the application of this state-law limitation on recovery—which would effectively result in the dismissal of Shaw's lawsuit—was consistent with § 1983's goals of compensation and deterrence.  *Id.* at 587-88.  In a "narrow" ruling, the Court concluded that applying Louisiana law would not undermine § 1983's goals due to the novelty of Shaw's situation and the likelihood that most other decedents asserting § 1983 claims would have a spouse, children, parents, or siblings to continue litigating such claims: "[S]urely few persons are not survived by one

of these close relatives . . . [so it] is therefore difficult to see how any of § 1983's policies would be undermined in Shaw's action were to abate. . . .  [G]iven that most Louisiana actions survive the plaintiff's death, the fact that a particular action might abate surely would not adversely affect § 1983's role in preventing illegality, at least in situations in which there is no claim that the illegality caused the plaintiff's death." *Id.* at 591-92, 594. The Court concluded by emphasizing that "[a] different situation might well be presented . . . if [state law] significantly restricted the types of actions that survive." *Id.* at 594.

The facts presented here do not fit within *Robertson*'s explicitly "narrow" holding. *Robertson* concluded that a finding of abatement wouldn't undermine § 1983's goal of deterrence because the case involved novel facts that were unlikely to recur in the future— thus, disallowing liability in that one instance wouldn't undermine the deterrence-related goal of ensuring that official misconduct is punished in a predictable and consistent fashion.  *Cf. Wheeler*, 894 F.3d at 1054 (concluding that the standing rules set forth in California's survivorship statute were not inconsistent with § 1983's objectives, even though application of the statute in that case caused the § 1983 claim to abate, because "California's survivorship law is expansive . . . and thus claims should rarely abate for lack of a proper plaintiff").  This case, in contrast, involves a common fact pattern—police officers stand accused of engaging in different forms of excessive force during an encounter that ultimately resulted in death.  Disallowing liability for some of the excessive force, simply because the final administration of excessive force was the cause of death, would undermine § 1983's goal of deterring law enforcement officers from engaging in any type of excessive force.

Accordingly, Defendants' motion to dismiss the estate's claim for pain-and-suffering damages arising from the fist strikes and taser use that preceded Mr. Andrich's death will be denied.

…

…

…

III.    Applicability Of A.R.S. § 14-3110's Standing Limitations In An Action Under 42 U.S.C. § 1983

As noted, Mr. Andrich's estate (via its personal representative, Louise Andrich) is not the only plaintiff in this action.  Three of Mr. Andrich's siblings (Louise Andrich, in her individual capacity, and minor siblings AL.A and AM.A) also seek to assert the § 1983 claims set forth in Counts I, II, and III.  (Doc. 31 ¶ 6.)  To be clear, all of these claims are premised on the violation of Mr. Andrich's constitutional rights, not the constitutional rights of the siblings.  (*See, e.g., id.* ¶ 33, emphasis added ["The actions and inactions of [Officers Kostas and Peters] deprived *Decedent* of [certain] clearly established rights under the United States Constitution . . . ."]; *id.* ¶¶ 42-43 [alleging violations of constitutional rights held by "Decedent"]; *id.* ¶ 53 [same].)

Defendants move to dismiss the siblings as parties, arguing that (1) under *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365 (9th Cir. 1998), the court must consult state law when determining who has standing to pursue a § 1983 action premised on a violation of a decedent's constitutional rights, and (2) the rule in Arizona, per A.R.S. § 14-3110, is that the personal representative of the decedent's estate is the sole party authorized to assert such a claim.  (Doc. 33 at 2-3.)  In response, Plaintiffs argue that (1) they have standing under California law, and (2) even if Arizona law is applicable, A.R.S. § 14-3110 cannot be applied here because it would undermine § 1983's objectives.  (Doc. 34 at 9-10.)

Plaintiffs' arguments lack merit.  First, the Court previously dismissed Plaintiffs' state-law claims after concluding those claims were governed by Arizona law, not California law.  (Doc. 29 at 13-17.)  Plaintiffs make no attempt to challenge that analysis or explain why it would somehow be inapplicable here.  Accordingly, the Court adopts the reasoning from its prior order and concludes that Arizona law, rather than California law, controls.

Second, Plaintiffs' challenge to the enforceability of A.R.S. § 14-3110's standing rule (*i.e.,* only the personal representative of the estate has standing to assert claims on behalf of a decedent) is cursory and unsupported by precedent.  (Doc. 34 at 17.)  Applying

that rule here would not undermine § 1983's goals of compensation and deterrence.  Again, the siblings are not purporting to assert claims based on the violation of their own constitutional rights.[4]  Instead, they merely wish to serve as additional parties (separate and apart from the personal representative of the estate) who are asserting § 1983 claims premised on the violation of Mr. Andrich's constitutional rights.  But any damage award arising from a showing that Mr. Andrich's rights were violated will be the same irrespective of how many parties have jointly asserted the claim.  Thus, applying A.R.S. § 14-3110's standing rule will have no impact on § 1983's goal of compensation.  Similarly, application of this rule will not undermine § 1983's goal of deterrence—this lawsuit will proceed, and Defendants will face potential liability, irrespective of whether the decedent's siblings join the personal representative of the estate as parties.  *Cf. Wheeler*, 894 F.3d at 1054 (upholding California's rule of survivorship standing even though it resulted in abatement of § 1983 claim); *Robertson*, 436 U.S. at 591-93 (upholding applicability of Louisiana's rule of survivorship standing even though it resulted in abatement of § 1983 claim).

Accordingly, all plaintiffs in this action will be dismissed except for Louise Andrich, in her capacity as personal representative of the decedent's estate.

IV.   <u>Failure To Intervene</u>

The Court previously dismissed, with leave to amend, Plaintiffs' claim in Count I against Officer Peters for failure to intervene.  (Doc. 29 at 7.)  The Court reached this conclusion because "[t]he FAC is devoid of any facts suggesting that Officer Peters could have intervened and stopped Officer Kostas from shooting Mr. Andrich.  To the contrary, the FAC makes it appear the shooting was a split-second decision by Officer Kostas."  (*Id.*)  The Court further noted that "Plaintiffs have not identified any cases upholding failure-to-intervene liability against police officers when the possibility of intervention wasn't established."  (*Id.*)

In the SAC, Plaintiffs add facts concerning the physical altercation that preceded

---

[4]     Nor could they.  *See, e.g., Ward v. City of San Jose*, 967 F.2d 280, 283-84 (9th Cir. 1991) (siblings could not assert individual § 1983 claims based upon the death of their brother because they lacked "a cognizable liberty interest in their brother's companionship").

the fatal shooting of Mr. Andrich.  Specifically, the SAC alleges that Officers Kostas and Peters "began to physically restrain Decedent with their hands and force unreasonably," "us[ed] hand and fist strikes against Decedent for no lawful purpose," and "deployed their Tasers at Decedent when such force was not need[ed]."  (Doc. 31 ¶ 20.)  The SAC then alleges that, leading up to the shooting, Officer Peters "had the opportunity to deescalate the situation and avoid all force" and further "had the ability" to prevent Officer Kostas from shooting Mr. Andrich.  (*Id.* ¶¶ 20-21.)

In their motion to dismiss, Defendants incorporate by reference the case law in their earlier motion to dismiss relating to qualified immunity and argue that "[t]here are no new facts related to the shooting, timing, proximity, or Officer Peters'[s] reasonable opportunity to intervene."  (Doc. 33 at 4.)  Plaintiffs counter that "the SAC alleges facts of Defendant Officer Peters'[s] failure to intervene having the opportunity to do so" and note that the SAC also alleges that Officer Peters escalated the situation with his use of force.  (Doc. 34 at 5.)

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000) (quotation omitted).  "If an officer fails to intervene when fellow officers use excessive force, despite not acting to apply the force, he would be responsible for violating the Fourth Amendment." *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1161 (E.D. Cal. 2016).  However, "officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham,* 229 F.3d at 1289. *See also Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) ("[T]he agents were positioned around the room away from Burns and Ting and were thus physically incapable of preventing the incidents surrounding the shooting, all of which transpired in a matter of seconds. Therefore, it cannot be said that the agents' failure to intervene was the cause in fact of Ting's injuries.").

Here, the SAC once again fails to allege any facts indicating that Officer Peters had the opportunity to stop Officer Kostas from shooting Mr. Andrich.  The possibility of

intervention is conclusory and unsupported by facts indicating, for example, Officer Peters's physical proximity to Officer Kostas at the time of the shooting.  Even assuming that Officer Peters escalated the situation through his initial use of fist strikes and a taser, such escalation doesn't show that he had the opportunity to intervene with respect to Officer Kostas's subsequent decision to shoot Mr. Andrich.  The SAC remains insufficient under *Iqbal*.

Finally, the doctrine of qualified immunity provides an alternative basis for dismissing the failure-to-intervene claim against Officer Peters.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  A government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (citation omitted).  Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).  *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).[5]

---

[5]    Ninth Circuit law is not a model of clarity concerning which party has the burden of proof when the defense of qualified immunity has been raised.  On the one hand, many Ninth Circuit opinions hold that "[o]nce the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  *See also Shafer*, 868 F.3d at 1118 ("Shafer argues that it is Deputy Padilla's burden to demonstrate that he did not violate Shafer's clearly established constitutional right.  Again, we disagree.").  On the other hand, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).  These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error

1    Here, Defendants explicitly raised the defense of qualified immunity in their motion
2    and cited cases in which courts conferred qualified immunity upon officers in analogous
3    circumstances. (Doc. 33 at 4.) In response, Plaintiffs proffered *Knapps v. City of Oakland*,
4    647 F. Supp. 2d 1129 (N.D. Cal. 2009), as their best case showing that Officer Peters's
5    conduct violated clearly established law. (Doc. 34 at 5-6.)

6    Plaintiffs' reliance on *Knapps* is misplaced. There, one police officer (Officer
7    Cardoza) "placed Plaintiff in a carotid hold by putting his arm around Plaintiff's neck and
8    dropping him to the ground" while two other officers (Officer Rojas and Sergeant Kelly)
9    were nearby. 647 F. Supp. 2d at 1142-43. After Officer Cardoza released the carotid hold,
10   Officer Rojas and Sergeant Kelly put handcuffs on the plaintiff. *Id.* at 1144. Officer
11   Cardoza then applied a "bent wrist hold," which is a "quite painful" technique for moving
12   a person who is handcuffed. *Id.* As the "bent wrist hold" was being applied, the plaintiff
13   complained that he was in pain, but Officer Rojas and Sergeant Kelly took no action. *Id.*
14   In the ensuing § 1983 action, the plaintiff asserted a failure-to-intervene claim against
15   Officer Rojas and Sergeant Kelly. *Id.* at 1159. Notably, as to the first use of excessive
16   force by Officer Cardoza (the carotid hold), the district court concluded that "given the
17   short time period in which the incident took place, and the lack of resistance from Plaintiff,
18   . . . it is possible that they [Officer Rojas and Sergeant Kelly] did not anticipate Officer
19   Cardoza's use of the hold. Because the violation happened so quickly, the Court finds that
20   they did not have a realistic opportunity to intercede." *Id.* at 1159-60. Meanwhile, as to
21   the second use of excessive force by Officer Cardoza (the bent wrist hold), the district court
22   concluded that Officer Rojas and Sergeant Kelly should be held liable because, *inter alia*,
23   (1) "[g]iven their proximity to Officer Cardoza, there is no evidence that anything
24   prevented them from stopping Officer Cardoza's unjustified use of the wrist lock," and (2)
25   "unlike the suddenness of the carotid hold, the use of the wrist lock occurred over a
26   relatively longer period of time" and "Plaintiff complained that the wrist hold was hurting

27   _____
     in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity
28   issues presented in this appeal. . . . [T]he applicable—and well-settled—rule is that '[t]he
     plaintiff bears the burden of proof that the right allegedly violated was clearly established
     at the time of the alleged misconduct.'") (citation and emphases omitted).

him." *Id.* at 1160.

If anything, *Knapps* supports Officer Peters's contention that he is entitled to qualified immunity. *Knapps* suggests that a police officer cannot be held liable, under a failure-to-intervene theory, when a fellow officer engages in a split-second use of excessive force (there, the carotid hold) and that failure-to-intervene liability is reserved for circumstances where the use of excessive force extends over a "relatively longer period of time," such that other officers in the vicinity have a reasonable opportunity to observe it, recognize its impermissible character, and take action to stop it (there, the bent wrist hold). Here, the SAC does not allege that Officer Peters had any inkling that Officer Kostas was planning to discharge his firearm, let alone a reasonable opportunity to stop Officer Kostas from doing so after realizing what was about to occur.

V.    Denial Of Medical Care

The Court previously dismissed, with leave to amend, Plaintiffs' claim in Count II for "denial of medical care." (Doc. 29 at 7-8.) The Court reached this conclusion because "[a]lthough the FAC asserts in conclusory fashion that Officers Kostas and Peters 'failed to provide timely medical care' and 'deprived [Mr. Andrich] of his right to receive medical care, treatment, and monitoring while seized or in custody,' there are no facts supporting those labels." (*Id.*)

In the SAC, Plaintiffs seek to remedy this deficiency by adding the allegations that (1) "twenty-nine minutes . . . passed from the time Decedent was shot before [Officers Kostas and Peters] . . . summoned medical care" and (2) "[h]ad proper life saving measures been applied, Decedent's death could have been avoided." (Doc. 31 ¶ 24.) Defendants don't specifically address Count II in their motion to dismiss but mention in passing that "[n]o new facts support the deliberate indifference to medical needs claims either." (Doc. 33 at 2.)

"Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."

*Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). "[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006).

Plaintiffs' new allegations are sufficient to allow this claim to proceed. Defendants' undeveloped request to dismiss Count II will be denied.

VI.   *Monell* Claim

The Court previously dismissed, with leave to amend, Plaintiffs' *Monell* claim against the City. (Doc. 29 at 8-9.) The Court concluded that the allegations pertaining to the City's alleged knowledge of the Officers' dangerous propensities were "labels and conclusions unsupported by facts" and that the alleged ratification of the killing was "conspicuously devoid of any facts showing who those policymakers were, how they approved and endorsed the challenged conduct, and when and where the endorsement occurred." (*Id.*)

Plaintiffs added new allegations to the SAC in an attempt to remedy these deficiencies. Specifically, the SAC now alleges that (1) "PPD led the nation's municipalities for fatal officer shootings in 2018 that resulted in the death of 23 citizens," (2) specific members of PPD leadership (Chief Jeri Williams and Executive Assistant Chief Michael Kurtenbach) were aware of a rise in fatalities and failed to react appropriately, (3) PPD failed to provide officer training on how to respond to individuals with schizophrenia, and (4) PPD failed to require its officers to document incidents in which they pointed their guns at citizens, despite knowledge that other cities' implementation of such a requirement resulted in fewer officer-involved shootings. (Doc. 31 ¶ 30.)

A *Monell* claim may be stated against a municipality (1) when "implementation of its official policies or established customs inflicts the constitutional injury," (2) "for acts of omission, when such omissions amount to the local government's own official policy," or (3) "when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional

decision or action and the basis for it." *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (quotations omitted).  To sufficiently plead a *Monell* claim and withstand a Rule 12(b)(6) motion to dismiss, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. Cty. of Tulare,* 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011)).[6]

### A.    **Official Policy, Practice, or Custom**

"Section 1983 suits against local governments alleging constitutional rights violations by government officials cannot rely solely on respondeat superior liability. Instead, plaintiffs must establish that the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation they suffered." *Hernandez*, 666 F.3d at 636 (internal quotation, brackets, and citation omitted).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, although the SAC *asserts* in conclusory fashion that the City maintained certain policies—including a policy of refusing to discipline officers who committed acts of misconduct, a policy of refusing to investigate allegations of unlawful force, a policy of sanctioning a code of silence to conceal wrongdoing, and a policy of fostering an atmosphere of lawlessness (Doc. 31 ¶ 53)—it fails to allege any *facts* to support those assertions.  *Cf. Moore v. City of Orange*, 2017 WL 10518114, *3 (C.D. Cal. 2017) (concluding that a similar list of policies lacked allegations of underlying facts and failed

---

[6]    Plaintiffs argue that, under *Shah v. Cty. of Los Angeles*, 797 F.2d 743 (9th Cir. 1986), a *Monell* claim should not be dismissed under Rule 12(b)(6) even if it is based on wholly conclusory allegations. (Doc. 34 at 12-13.)  This argument is unavailing. "[F]ollowing the Supreme Court's decisions in *Twombly* and *Iqbal*, courts in this circuit have moved from such a lax standard, instead requiring that plaintiffs plead facts showing a plausible claim for municipal liability." *Cuviello v. City & Cty. of San Francisco*, 940 F. Supp. 2d 1071, 1090 (N.D. Cal. 2013).

1
2
3

to meet the *Iqbal* pleading standard).  Nor does the SAC plead any facts indicating that these alleged policies, even if they existed, were the moving force behind Mr. Andrich's injuries.

4

   B.   **Omissions**

5
6
7
8
9
10
11

   Some of Plaintiffs' allegations are best categorized as claims that the City made omissions that caused Mr. Andrich's injuries.  Among these are the City's alleged failures in adequately supervising officers, providing training relating to schizophrenia, and providing training and supervision with respect to the proper use of force (and the reporting of the use of force) against civilians.  (Doc. 31 ¶¶ 53-54.)  Plaintiffs' new factual allegations pertaining to the number of officer-related shootings and fatalities by PPD are also intended to support the claim that these omissions amount to deliberate indifference.  (*Id.* ¶ 30.)

12
13
14
15
16
17
18
19
20
21

   "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.*  Thus, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . .  Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.* at 62 (internal quotations omitted).[7]

22
23
24
25

   Here, Plaintiffs' new allegations remain deficient under *Connick*.  The raw number of police shootings by PPD in 2018 doesn't show that PPD had notice of a pattern of "similar constitutional violations"—the SAC does not allege any facts concerning the other

26
27
28

---

[7]    In *Connick*, the Supreme Court also recognized "the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  563 U.S. at 64.  However, Plaintiffs do not attempt to advance a claim of single-incident liability for failure to train—their claim is premised on an alleged pattern of preexisting violations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

shootings, let alone facts suggesting that the other shootings involved individuals with schizophrenia and/or were unjustified.  *See, e.g., Johnson v. City of Vallejo*, 99 F. Supp. 3d 1212, 1222 (E.D. Cal. 2015) (rejecting *Monell* claim founded on evidence of other officer-involved shootings because "there is insufficient evidence that any of the other shootings by police resulted in constitutional violations").  *Compare Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1173 (E.D. Cal. 2019) (allowing *Monell* claim to proceed where plaintiffs identified several instances of force by the defendants and "[a]ll of [the] alleged incidents appear[ed] to involve allegations of excessive use of force").

The SAC also asserts that the City knew that Officers Kostas and Peters "had in the past and since Decedent's incident, committed similar acts of unlawful force, falsifying reports, suppressing evidence, dishonesty and abuse, thereby enabling [them] to continue to violate the constitutional rights of the Decedent."  (Doc. 31 ¶ 53.)  However, the SAC does not identify any facts to support this conclusory assertion.

### C.    **Ratification**

As noted, the Court held that Plaintiffs' attempt to advance a ratification-based *Monell* claim in the FAC was deficient because the FAC was "conspicuously devoid of any facts showing who those policymakers were, how they approved and endorsed the challenged conduct, and when and where the endorsement occurred."  (Doc. 29 at 9.)  The SAC does identify, by name, two members of PPD leadership.  (Doc. 31 ¶ 30.)  The SAC continues to be deficient, however, because it fails to allege facts as to how these policymakers approved of and endorsed the shooting of Mr. Andrich and when and where that alleged endorsement occurred.

Accordingly, Plaintiffs' *Monell* claim will be dismissed.

### VII.    Rule 8 Violations

Defendants argue that Plaintiffs' SAC is now unreasonably complicated—a "kitchen-sink" complaint—in a manner that violates Rule 8.  (Doc. 33 at 5.)  Plaintiffs respond that Defendants waived this argument by failing to include it in their first motion to dismiss.  (Doc. 34 at 11-12.)  In reply, Defendants state that "[t]he claim that should

remain in clearly plead, . . . single sentence paragraphs, without boilerplate kitchen-sink allegations, is a solitary federal law excessive force claim asserted only by the Personal Representative of the Estate."  (Doc. 35 at 10.)

Although the SAC is not a model of clarity, it serves to put Defendants on sufficient notice of why Plaintiffs are suing them, for what injuries, and on what legal basis. Furthermore, the Court has now dismissed several aspects of the SAC that Defendants found objectionable, including the failure-to-intervene claim against Officer Peters in Counts I, the *Monell* claim in Count III, and the claims by plaintiffs other than the personal representative of the estate.  Accordingly, the motion to dismiss for Rule 8 violations—to the extent Defendants intended it to be a basis for dismissing the SAC—is denied.

VIII.   <u>Leave To Amend</u>

Plaintiffs, in passing, request leave to amend should the Court grant Defendants' motion to dismiss "because justice so requires."  (Doc. 34 at 21.)  Defendants state in their reply that they do not oppose this request as it pertains to the estate's excessive force claim in Count I against Officer Kostas, which they would like to see written "in clearly plead, . . . single sentence paragraphs, without boilerplate kitchen-sink allegations."  (Doc. 35 at 11.)

"Rule 15 advises the court that leave [to amend] shall be freely given when justice so requires.  This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citations and internal quotation marks omitted).   Nevertheless, "liberality in granting leave to amend is subject to several limitations."  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citation and internal quotation marks omitted).  "Those limitations include undue prejudice to the opposing party, bad faith by the movant, futility, and undue delay."  *Id.*  Also, "when a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is 'particularly broad.'"  *Chodos v. W. Publishing Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (citation omitted).

Plaintiffs' request for leave to amend will be denied.  After Plaintiffs filed the

original version of their complaint in April 2019 (Doc. 1), Defendants prepared and filed a motion to dismiss (Doc. 17).  In response, Plaintiffs filed the FAC (Doc. 18), which mooted Defendants' motion (Doc. 24).  Defendants then prepared and filed a motion to dismiss the FAC (Doc. 26), which the Court granted in significant part (Doc. 29).  The dismissal order provided specific instructions concerning why some of the counts of the FAC were deficient and how Plaintiffs could remedy those deficiencies.  Unfortunately, Plaintiffs were unable, in their SAC, to remedy the deficiencies as to their failure-to-intervene claim against Officer Peters in Count I and the *Monell* claim in Count III, prompting Defendants to prepare and file yet another motion to dismiss (Doc. 33).  This case is now approximately 15 months old and is still at the pleading stage.  Affording Plaintiffs yet another opportunity to amend would, under the circumstances, result in undue delay, be unduly prejudicial to Defendants, and potentially be futile.

Accordingly, **IT IS ORDERED** that Defendants' motion to dismiss (Doc. 33) is **granted in part and denied in part**.

Dated this 30th day of June, 2020.

Dominic W. Lanza
United States District Judge