Diana Zeesman, Esq. (SBN 031294)
**ACCIDENT FIGHTERS APC**
6320 Canoga Avenue, Ste. 1500
Woodland Hills, California 91367
Telephone: (855) 646-4878
Facsimile:  (855) 450-0989
Email: Contacts@AccidentFighters.com

Kevin S. Conlogue, Esq.
*Pro hac vice*
**LAW OFFICE OF KEVIN S. CONLOGUE**
292 S. La Cienega Blvd., Ste. 207
Beverly Hills, CA 90211
Telephone: (213) 255-8837
Facsimile:  (213) 477-2069
Email: Kevin@LOKSC.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louise Andrich, et al., | Case No.: 2:19-cv-02212-DWL |
| Plaintiffs, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Gus Kostas, et al., | |
| Defendants. | |

## I.   **INTRODUCTION**

This is a classic case of 'we said, he's dead' in which Defendants' motion for summary judgment attempts to take advantage of the fact that Decedent Alexandre Andrich ("Mr. Andrich") has passed and cannot contest Defendants' version of the force and shooting incident causing his death. However, direct evidence of the shooting captured by cell phone video (Ex. 9) contradicts Defendants' version of events as it does not show Mr. Andrich swinging an arm or lunging at Officer Kostas before he is shot. Additionally, Ryan Dickerman, the Extended Stay Hotel manager,

1   witnessed the assault in the Hotel parking lot and never saw Mr. Andrich punch,
2   strike, or attempt to do so against Defendants. Furthermore, Patrick McGee, who
3   captured the shooting on video, did not see Mr. Andrich strike or attempt to strike
4   Officer Kostas immediately before being shot. Simply, Defendants' version of events
5   is inconsistent with other evidence, such as no witness seeing Mr. Andrich strike
6   Defendants, Defendants not having reported or photographed injuries from the
7   incident, Mr. Andrich being tased in the back, and Mr. Andrich shot in the left side of
8   his torso without warning when his handcuffed-right-hand was furthest from Officer
9   Kostas. With these inconsistencies, summary judgment should be denied. *Newmaker*
10  *v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).

    In the light most favorable to Plaintiff, the evidence shows Mr. Andrich,
11
12  mentally disturbed, being violently assaulted and shot without warning when no one's
13  safety was immediately threatened. The only evidence supporting Defendants' version
14  of events is Defendants' word. As a result, Defendants' motion should be denied.

15  **II.   STATEMENT OF FACTS**

16      The day prior to the shooting an incident took place involving Mr. Andrich
17  that lasted several hours in which Mr. Dickerman called police. (Ex. B 7:14-22, 14:7-
18  15:17.) The Crisis Intervention Team ("CIT") was required as Mr. Andrich barricaded
19  himself in his room with apparent mental health issues as he believed people were in
20  his microwave. (Ex. B 16:2-18.) The CIT are specialized officers that have expert
21  training in handling individuals with mental illness and crisis. (Ex. C 82:3-17; Ex. D
22  81:18-21; Ex. E 41:16-18.) After several hours, the CIT withdrew with the supervising
23  officer stating "the juice is not worth the squeeze," and represented to Mr. Dickerman
24  to call the police when Mr. Andrich came out of his room and responding offices will
25  be up to speed. (Ex. B 20:1-21:21.) No physical violence took place.

26  **A.   Initial Contact Of Mr. Andrich & Assault In Front Of Hotel**

27      On June 12, 2018, Officer Peters responded to a dispatch call for trespassing at
28  the Hotel. (Ex. D 63:6-17.) He was informed Mr. Andrich was acting crazy. (Ex. D

64:25-65:1.) Officer Peters saw and contacted Mr. Andrich from his patrol car while Mr. Andrich was walking on Osborn towards Central. (Ex. D 68:11-22.) Mr. Andrich was five-foot-ten-inches tall and about 150-165 lbs., and Officer Peters was six-foot-two-inches tall and about 250-260 lbs. (Ex. D 20:17-21; 96:23-97:2.) Officer Kostas saw Mr. Andrich and Officer Kostas while his patrol car was in the turn lane on Osborn. (Ex. C 169:20-171:15.) Officer Kostas believed that Mr. Andrich was not in sound mind, had mental health issues, and likely mentally disabled. (Ex. E 46:18-47:9, 78:12-15.) Mr. Andrich did not have any facial abrasions or bruises. (Ex. C 200:24-201:13, 201:18-24; Ex. D 153:7-10.) Mr. Andrich then walked away from the officers, and Officer Peters parked next to the Hotel to discuss the incident with Officer Kostas, who had learned CIT had contact with Mr. Andrich the night before. (Ex. C 174:24-175:25; Ex. D 76:24-77:16.) Defendants had no knowledge of events involving Mr. Andrich before June 11, 2018. (Ex. C 16:6-9; Ex. D 17:3-5.)

Defendants then got a dispatch call that Mr. Andrich returned to the Hotel lobby. (Ex. D 83:8-15.) Defendants intended to detain Mr. Andrich, not arrest him. (Ex. C 67:25-68:8; 68:22-24.) Officer Peters walked into the lobby and saw Mr. Andrich helping himself to coffee. (Ex. D 85:10-16.) Mr. Andrich was wearing a shirt and backpack. (Ex. D 85:24-86:2.) Although Defendants' motion claims Mr. Andrich was dangerous at this point, video shows a guest calmly sitting a few feet from Mr. Andrich and Officer Peters. (Ex. 10 at 5:35.) Officer Peters asked Mr. Andrich to exit, and he peacefully complied without incident and exited the Hotel lobby with a covered cup of coffee in each hand.  (Ex. C 182:4-14; Ex. D 86:7-18; Ex. R p. 3.)

Outside, Officer Kostas did not see any dangerous objects in Mr. Andrich's hands. (Ex. C 235:11-19.) Officer Peters then slapped a coffee out of Mr. Andrich's hands, Officer Kostas slapped the other coffee, and "the fight was on." (Ex. D 92:7-19.) Mr. Andrich never made a threatening motion to Defendants with the cups of coffee. (Ex. C 235:22-24; Ex. E 90:13-24.) Defendants got no coffee on them. (Ex. C 184:25-185:3; Ex. D 96:1-5.) Mr. Dickerman, from his office, saw the altercation

1
2
3
4
5
6

between Defendants and Mr. Andrich. (Ex. B 34:2-35:5.) During the entire incident, Mr. Dickerman did not see Mr. Andrich strike or hit either officer as Mr. Andrich's back was to them or he was on the ground. (Ex. B 47:4-24, 82:23-25.) He did not see Mr. Andrich throw any punches. (Ex. B 82:4-17.) However, he saw Officer Kostas throw punches. (Ex. B 38:10-20.) Mr. Dickerman also did see Defendants use aggressive police maneuvers against Mr. Andrich. (Ex. B 36:12-37:3.)

7
8
9
10
11
12
13
14
15
16
17
18

After the coffees were out of Mr. Andrich's hands, Officer Kostas grabbed Mr. Andrich's right wrist and left shoulder. (Ex. C 184:3-7.) When Officer Kostas grabbed Mr. Andrich's wrist, he did not tell Mr. Andrich that he was under arrest or tell Mr. Andrich that he was under arrest at any time during the incident. (Ex. C 237:17-238:8.) Officer Kostas handcuffed Mr. Andrich's right wrist.  (Ex. C 186:6-8.)Then while standing, Officer Kostas threw six to eight punches, some connecting, and three to four knee strikes. (Ex. C 188:9-12, 190:5-10.) At this time, Mr. Andrich did not try to kick or punch Officer Kostas. (Ex. C 188:13-17; Ex. E 66:16-21.) Then, Officer Peters was trying to sweep Mr. Andrich's legs. (Ex. C 190:11-21.) Officer Peters tried two leg sweeps to take Mr. Andrich down and was successful with the second. (Ex. D 101:14-102:2.) Officer Peters injured his leg by the leg sweep and landing on his knee, not a strike from Mr. Andrich. (Ex. D 102:3-21.)

19
20
21
22

Mr. Andrich went to the ground on his knees or sitting, and then back on his feet. (Ex. C 191:5-192:3.) Officer Kostas then squared up on Mr. Andrich and threw punches at him with some connecting. (Ex. C 239:19-240:3.) Officer Kostas threw about six more punches because he "was trying to knock him out." (Ex. C 194:4-15.)

23
24
25
26
27
28

Mr. Andrich was then tased twice in the Hotel parking lot. (Ex. D 115:23-116:5.) First, Officer Kostas backed off Mr. Andrich with Officer Peters deploying his taser in Mr. Andrich's back. (Ex. C 195:16-6:1-5.) Contrary to the autopsy report, Defendants claim Officer Peters' taser struck Mr. Andrich's chest. (Ex. C 196:6-9; Ex. D 112:13-22; Ex. G p. 3.) Then, Mr. Andrich was walking away when Officer Kostas tased Mr. Andrich in his back without warning. (Ex. B 40:18-41:1; Ex. C 196:25-

1  197:10; Ex. G p. 3.) It is against PPD policy to shoot a suspect in the back with a

2  Taser while fleeing. (Ex. C 48:21-23; Ex. K p. 1, 6.) Three of the four taser prongs, or

3  barbs, were still in Mr. Andrich's back during his autopsy. (Ex. G p. 3.)

4      **B.    Officer Kostas Shooting Of Mr. Andrich**

5          Officer Kostas then pursued Mr. Andrich on foot. (Ex. C 199:8-14.) Officer

6  Peters called for air unit support and K-9 support. (Ex. C 199:15-22.) Officer Kostas

7  did not know if Officer Peters was injured during this pursuit. (Ex. C 244:17-245:7;

8  Ex. D 128:25-129:3.)

9          Patrick McGee is the only known independent witness to the foot pursuit and

10  Officer Kostas shooting Mr. Andrich. (Ex. A 7:18-24.) Mr. McGee observed twenty to

11  thirty seconds leading up to the incident and recorded the shooting incident and about

12  ten seconds leading up thereto. (Ex. A 15:2-18, 29:1-12; Ex. 9.) Officer Kostas does

13  not dispute the accuracy of Mr. McGee's video. (Ex. C 15:20-25.) Mr. McGee was

14  driving eastbound on Osborn towards the intersection controlled by a light on Central

15  and Osborn. (Ex. A 16:21-17:1.) Mr. McGee first noticed Officer Kostas and Mr.

16  Andrich on the sidewalk to the passenger-side of his car as he was coming to a stop at

17  the intersection. (Ex. A 18:2-18, 19:6-15.) Mr. McGee observed that Mr. Andrich had

18  a bloodied face. (Ex. A 28:20-22.) Mr. McGee believed Mr. Andrich appeared

19  mentally disturbed. (Ex. A 29:13-30:10; 37:5-14.) Mr. McGee did not observe any

20  bruises or blood on Officer Kostas as if he had been in a fight. (Ex. A 28:23-25.)

21          When Mr. McGee first saw the two, Mr. Andrich was swatting Officer Kostas

22  hands away. (Ex. A 19:19-23, 22:12-17, 23:6-12.) Mr. Andrich did not strike Officer

23  Kostas' head or body when he was "swatting [him] away and trying to keep the

24  officer at distance." (Ex. A 20:17-21:4, 23:15-17.) The only time Mr. Andrich

25  attempted to swat Officer Kostas away was when Officer Kostas went to grab him.

26  (Ex. A 23:18-25.) This swatting occurred only on the passenger side of Mr. McGee's

27  car. (Ex. A 38:2-4.) Then, Mr. Andrich and Officer Kostas crossed the street behind

28  Mr. McGee to the northside of Osborn. (Ex. A 20:5-12.) Mr. McGee began to record

1   the incident. (Ex. A 24:14-22.) Officer Kostas closed the distance with Mr. Andrich.

2   (Ex. D 124:21-24; Ex. C 118:3-12, 136:24-137:4.) Mr. McGee then saw Officer

3   Kostas discharge his gun. (Ex. A 8:10-12.) Officer Kostas was 10 to 12 feet away.

4   (Ex. E 49:12-16; Ex. N 15:02.) In the 9 seconds leading up thereto, Mr. Andrich did

5   not swat at Officer Kostas or attempt to swat at him. (Ex. A 28:5-19, 43:5-11; Ex. 9.)

6   Mr. Andrich did not lunge at or raise his right hand in an attempt to strike Officer

7   Kostas before being shot. (Ex. 9; Ex. H p. 24.) Officer Kostas shot the left side of Mr.

8   Andrich's torso.  (Ex. G p. 3.) Officer Kostas believed Mr. Andrich was mentally

9   unstable and not in sound mind before he shot him. (Ex. C 236:19-237:3.) Officer

10  Kostas did not see Mr. Andrich lunge at him before shooting. (Ex. C 108:25-109:5.)

11       In the video at the beginning, Mr. Andrich's left-unhandcuffed arm is closest

12  to Officer Kostas.  (Ex. C 128:12-24; Ex. 9.) In the first five seconds of the video, Mr.

13  Andrich does not take a swing at Officer Kostas and did not step towards Officer

14  Kostas.  (Ex. C 129:18-130:5, 131:18-21; Ex. 9.) After six seconds, Mr. Andrich's

15  right-handcuffed arm is in front of Mr. Andrich and furthest from Officer Kostas.

16  (Ex. C 132:9-16; Ex. 9.) At this point, Officer Kostas was unholstering his gun. (Ex. C

17  132:17-133:1; 140:25-141:4.)  At six seconds, Officer Kostas had decided to use

18  deadly force as he was unholstering his gun.  (Ex. C 140:2-24, 144:19-22.)

19       Mr. McGee was shocked when he saw Officer Kostas shoot Mr. Andrich. (Ex.

20  A 31:8-16.) Officer Kostas did not provide any warnings before he discharged his

21  gun. (Ex. A 25:18-23; Ex. C 97:23-98:4, 98:21-24; Ex. D 128:18-21; Ex. E 49:8-11.)

22  No bystanders were in danger when Officer Kostas shot his gun, and Mr. McGee

23  never saw Mr. Andrich try to hurt any bystanders. (Ex. A 25:9-12; Ex. C 97:1-13,

24  149:7-13; Ex. E 49:2-7.) Officer Kostas never saw Mr. Andrich threaten any

25  bystanders with the handcuff on his right wrist. (Ex. C 251:14-19.)

26       After the gun fired, Mr. McGee saw two other officers in addition to Officer

27  Kostas in the area approaching from Central about to converge on Mr. Andrich.  (Ex.

28  A 26:6-17, 27:8-13, 38:22-39:4.) While pursuing Mr. Andrich on foot, it was feasible

for Officer Kostas to maintain a close distance with Mr. Andrich where Mr. Andrich could not strike him while he waited for backup. (Ex. C 117:19-118:1.) During the pursuit, Officer Kostas had his OC spray. (Ex. C 118:13-119:4.) And, before discharging his weapon, Officer Kostas still had his radio and could communicate with dispatch. (Ex. C 119:20-120:14.)

The time for the entire incident from the hotel parking lot to the shooting took around 10 minutes. (Ex. E 77:23-78:2.) This is not an immediate defense of life situation, and a reasonable officer would not have used lethal force. (Ex. H p. 24.) Officer Kostas use of lethal force violated his training as this was not an immediate defense of life situation, there were other reasonable measures available, and warnings that deadly force will be used were not provided. (Ex. H p. 29.)

C.      **Det. Winter's Interviews & Defendants' Inconsistent Statements**

Detective Winter was the primary homicide detective assigned to the shooting of Mr. Andrich. (Ex. E 8:3-9.) His duties included gathering evidence, facts, statements, and document officer injuries. (Ex. E 21:18-22:7, 54:7-11.)

On June 12, 2018, at 10:33 a.m., Det. Winter conducted his walkthrough interview of Officer Kostas on scene. (Ex. E 49:17-20, 58:10-14.) Officer Kostas indicated he initially began striking Mr. Andrich's face because he believed Mr. Andrich was reaching for Officer Peters' duty belt. (Ex. E 63:5-10, 65:17-66:21; Ex. N 5:55.) PPD policy provides closed fist strikes may be used to strike the face and head "only when reasonable as a means to overcome a violent attack." (Ex. K p. 9.) When he fired his gun, Officer Kostas stated that Mr. Andrich got into a fighting stance and cocked back, meaning Mr. Andrich pulled his hand back towards his shoulder like he was going to punch somebody. (Ex. E 75:19-76:9.) Officer Kostas did not tell Det. Winter that Mr. Andrich swung his handcuff arm at Officer Kostas before he shot. (Ex. E 73:2-76:9; Ex. Q p. 3.) During the walkthrough, Officer Kostas marked the scene with a blue cone where he was standing when he discharged his weapon, and an orange cone where Mr. Andrich was located at the same time.  (Ex. C

12:7-16, 104:14-105:5; Ex. P.) Det. Winter did not document any injuries of Officer Kostas, Officer Kostas did not tell him he had any injuries, and photographs do not depict injuries sustained by Officer Kostas. (Ex. E 54:12-14; Ex. C 122:12-123:1, 137:24-138:1, 219:23-220:3, 222:12-15; Ex. L.) Det. Winter did not see any damage to Officer Kostas' uniform from the incident. (Ex. E 126:10-19.)

At his deposition, Officer Kostas' story was different. Officer Kostas' claimed he began striking Mr. Andrich in the parking lot after he saw Mr. Andrich "striking Officer Peters" and was grabbing onto his duty belt, not reaching for the belt. (Ex. C 186:9-187:6.) When Mr. Andrich was on his knees or sitting and then stood up in the parking lot, Officer Kostas' story changed during his deposition as to whether or not Mr. Andrich attacked Officer Peters at that point. (Ex. C 193:22-194:3 ("No"), 239:15-18 ("Correct").) When discharging his gun, Officer Kostas claimed that Mr. Andrich swung the handcuffed arm at him, not cocked back or attempted to punch him with a closed fist. (Ex. C 108:14-25; 121:16-22.) The video does not depict Mr. Andrich swinging his right-handcuffed hand at Officer Kostas.  (Ex. 9.)

On June 12, 2018, at 12:36 p.m., Det. Winter interviewed Officer Peters. (Ex. E 50:2-4.) Officer Peters did not indicate that Mr. Andrich attempted to throw coffee on either officer. (Ex. E 90:13-24.) Officer Peters also did not state that Mr. Andrich went for his duty belt before he swept Mr. Andrich to the ground. (Ex. E 91:24-92:11.) Officer Peters indicated that when the shooting occurred and contrary to the video, Mr. Andrich first lunged at Officer Kostas, then Officer Kostas created distance, drew his gun, and shot Mr. Andrich. (Ex. E 50:13-51:2) The only injury of Officer Peters that Det. Winter documented was a right knee injury from when Officer Peters attempted to sweep Mr. Andrich to the ground. (Ex. E 54:15-23.) Det. Winters did not observe any other injuries to Officer Peters, including any facial injuries. (Ex. E 82:2-9, 94:7-20.) During an officer-involved force investigation, a color grid is photographed next to an injury to document an injury, but no color grid photograph was taken of Officer Peters' face. (Ex. D 160:15-24; Ex. M; Ex. E 83:18-15.)

During Officer Peters' deposition, he claimed Mr. Andrich was going for his gun belt, but he did not strike Mr. Andrich with any punches as a result. (Ex. D 100:17-101:12.) After sweeping Mr. Andrich to the ground, he saw Officer Kostas punch Mr. Andrich on the ground. (Ex. D 101:14-102:25.) While on the ground applying pressure behind Mr. Andrich's ear, Officer Peters claimed Mr. Andrich struck him "in the head with the handcuff and the fist" above his left eye causing a cut above his left eyebrow. (Ex. D 105:20-107:3.) Photographs of Officer Peters do not depict a cut anywhere above his left eye or face. (Ex. M p. 3; Ex. D 159:11-17.)

**D.      Events After The Shooting**

After Mr. Andrich was shot, Officer Peters saw Mr. Andrich breathing when he arrived. (Ex. D 60:8-18.) Officer Peters did not provide CPR, hands-on life saving measures, or compression to the wound site of Mr. Andrich. (Ex. D 127:14-128:5.) Officer Kostas indicated that he did not provide any life saving measures until about five minutes after the shooting. (Ex. C 147:16-19.) But, Mr. Dickerman did not see Defendants perform any CPR. (Ex. B 44:4-45:8.) Exhibit 11 does not depict any life saving measures provided by Defendants. (Ex. C 159:21-160:20.) Defendants never applied any pressure to the bullet hole wound of Mr. Andrich. (Ex. C 146:10-15.) And, anytime CPR is used, someone's chances of survival increases. (Ex. F 59:12-20.)

Defendants failed to provide Mr. Andrich immediate medical treatment to control or stop the bleeding and to provide CPR. (Ex. H p. 31.) PPD's own policies require an officer to render first aid with a use of force injury. (Ex. H. p. 32.) Officer Kostas was trained in providing life support measures, CPR, and first aid. (Ex. C. 84:5-21.) He was also trained that while in the field when life saving measures are required, he is to provide life saving measures until someone with equal or higher training arrives. (Ex. C 84:12-20.) And, with a gunshot wound, Officer Kostas knew that controlling and stopping the bleeding is an important aspect of life saving measures. (Ex. C 85:8-13.) Officer Peters, trained in CPR and first aid, also knew he was to apply direct pressure if a suspect was bleeding. (Ex. D 59:1-8, 59:17-20.)

On June 13, 2018, William T. Stano, III, M.D., conducted the autopsy of Mr. Andrich. (Ex. G p. 2.) Dr. Stano determined the cause of death to be a gunshot wound of torso with manner of death as homicide. (Ex. G p. 2.) Dr. Stano found the gunshot to be at an intermediate range with no powder or soot and with an entrance on the left side of Mr. Andrich's chest and the bullet lodged in his right armpit. (Ex. F 33:7-10, 37:6-12; Ex. G p. 5.) Mr. Andrich also had four barb puncture sites on his back with three barbs still present. (Ex. F 39:21-40:7; Ex. G p. 3.) Mr. Andrich's face had multiple abrasions and contusions to his face, including a 1 inch abrasion on his right forehead, 2 inch wound on his left forehead, ¾ inch abrasion/contusion on left cheek below eyelid, ¼ inch abrasion below lateral edge of left eyebrow, ¼ inch contusion on lateral edge of right eye, and ¾ blue contusion covering left lower eyelid. (Ex. F 38:18-39:15; Ex. G p. 6.) Mr. Andrich's fingernails and thumbnails were clean and intact. (Ex. G p. 5.) The toxicology testing for Mr. Andrich was negative for alcohol and controlled substances. (Ex. F 30:11-21.)

### E.   Standards On The Use Of Force, Deadly And Non-Deadly

Defendants failed to formulate a tactical plan here, which promotes officer and suspect safety as known by Defendants. (Ex. H p. 17; Ex. C 60:13-21, 64:14-23, 65:13-18, 66:13-67:1, 78:13-16, 78:25-79:5; Ex. D 47:17-48:1.) Also, Officer Kostas' decision to pursue Mr. Andrich alone on foot without air support or K9 unit setting a perimeter was a poor tactical decision. (Ex. H p. 19-21; Ex. C 74:5-9; Ex. D 58:1-19.) And, prior to this incident, Officer Kostas has utilized air units to establish a perimeter of a suspect fleeing on foot. (Ex. C 75:17-21.) Officer Kostas also failed to utilize less lethal force options before shooting Mr. Andrich, such as his OC spray that has an effective range of 12-15 feet without an issue of cross-contamination as the incident occurred outdoors without wind. (Ex. H p. 22-23; Ex. C 57:4-9; Ex. 9.) Officer Kostas additionally failed to act as a reasonable officer by not providing Mr. Andrich a verbal warning that he was going to fire his gun. (Ex. H p. 23-24.) PPD policies require a verbal warning "[w]hen the shooting of a subject appears imminent." (Ex. K p. 12.)

1    Before the incident, Officer Kostas was trained that deadly force is the highest
2  level of force that could be used only in an immediate defense of life situation as a last
3  resort, must show a reverence for human life, that warnings are be given when feasible
4  before deadly force is used, and that other available reasonable measures are to be
5  used and exhausted beforehand. (Ex. C 26:24-27:12, 28:21-29:5, 31:1-24.)  He also
6  knew that the use of deadly force is based upon an objective, reasonable officer's
7  perception before force is used. (Ex. C 29:22-30:15.) And, he must be constantly
8  reevaluating the situation before a shot is fired. (Ex. C 31:19-23.) Officer Kostas was
9  trained that a fleeing suspect alone does not justify shooting that suspect.  (Ex. C
10  42:17-43:9.) And, if a citizen is walking away from Officer Kostas with a dangling
11  handcuff, Officer Kostas does not have the right to use deadly force. (Ex. C 251:8-12.)

12    With non-deadly force, Defendants were trained that closed-fist strikes can be
13  used only to overcome a violent attack. (Ex. C 45:13-15; 36:9-13.) And before using
14  closed fist strikes, officers are trained to de-escalate the situation first if possible. (Ex.
15  D 36:17-22.) Defendants were also trained that their issued Tasers, with two cartridges
16  that can be fired at separate times, are used when a suspect is displaying an imminent
17  threat to an officer or another individual. (Ex. C 48:10-12, 49:15-23; Ex. D 37:22-
18  38:2, 38:13-39:11.) And, Defendants were trained that OC spray is used for a suspect
19  resisting arrest, to prevent the possibility of injury to an officer, and can delay and
20  slow down a suspect. (Ex. C 53:10-12, 54:8-21, 59:10-13.)

21    With foot pursuits, Officer Kostas was trained to keep his tactical options
22  open, be aware of areas for cover or safety, and wait for backup when practical. (Ex. C
23  70:6-15, 72:21-73:1.) Officer Kostas was trained that he was to move back instead of
24  closing the distance on a felon suspect who is a threat. (Ex. C 78:13-16, 79:7-14,
25  78:25-79:5.) And, Officer Kostas failed to activate his body worn camera issued
26  during the incident in violation of PPD policy. (Ex. C 86:19-21, 87:11-88:10, 88:22-
27  89:19, 91:5-12; Ex. H p. 30.)
28  //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III. **ARGUMENT**

### A.     **Legal Standard For A Motion For Summary Judgment**

Summary judgment cannot be granted where there is a "genuine dispute" as to any "material fact." Fed. R. Civ. P. 56(a); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue for trial, the court must view the evidence in the light most favorable to the non-moving party. *Id.*, 477 U.S. at 255. Summary judgment is a drastic remedy and is therefore to be granted cautiously.  *Id.* ("trial courts should act . . . with caution in granting summary judgment"). After drawing all inferences in favor of the responding party, summary judgment will be granted only if all reasonable inferences defeat the non-moving party's claims. *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir. 1982). Reasonable doubts about the existence of a factual issue should be resolved against the moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contr. Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). And, the non-movant's version of any disputed issue of fact is presumed correct. *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992). Even entirely circumstantial evidence is sufficient to create a triable issue of fact.  *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992).

The Ninth Circuit has urged special caution in cases where alleged excessive force resulted in death. "Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker*, 842 F.3d at 1116; *Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014); *C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Courts cannot "simply accept what may be a self-serving account by the police officer" because the person most likely to rebut the deputy's version of the events has been killed and cannot testify. *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014). Thus, "[t]he judge must carefully examine all the evidence in the

record, such as medical reports . . . and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with the known facts." *Scott*, 39 F.3d at 915; *see also Gonzalez*, 747 F.3d at 794-95. Further, because the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom...summary judgment...should be granted sparingly" in unreasonable force cases. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). And, when facts offered by a party at the summary judgment stage are contradicted by videotape, a court should view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

As discussed below, the video and witnesses Mr. Dickerman and Mr. McGee contradict Defendants' version of events and reasonable minds could differ on the inferences to be drawn from the evidence presented, and as such, Defendants' motion for summary judgment should be denied.

## B.   <u>Defendants' Use Of Any Force Was Unreasonable</u>

Determining whether use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Tennesse v. Garner*, 471 U.S. 1, 8 (1985)); *Espinoza v. City & Cnty. of San Fran.*, 598 F.3d 528, 537 (9th Cir. 2010). Factors to consider include "the severity of the crime at issue, whether the suspect poses no immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). Whether a suspect is emotionally disturbed is a factor which should be "assigned greater weight." *Glenn*, 673 F.3d at 875. Courts "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case . . ." *Id.* at 872.

The Ninth Circuit has long held that "where there is no need for force, *any* force used is constitutionally unreasonable." *See, e.g., Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("force is only justified when there is a need for force"); *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001); *P.B. v. Koch*, 96 F.3d 1298, 1303-04 n. 4 (9th Cir. 1996) ("since there was no need for force, [defendant's] use of force was objectively unreasonable").

Here, there was no need for force against Mr. Andrich at any time. Defendants began the assault in the parking lot by knocking the coffee out of Mr. Andrich's hands after he complied with their orders. Officer Kostas's own admission was that he began punching and striking Mr. Andrich when Mr. Andrich was not punching anyone or even attempting to do so. Mr. Dickerman indicated in the parking lot that Mr. Andrich's back was to Defendants or he was on the ground, suggesting Mr. Andrich was not acting aggressively to Defendants. Mr. Dickerman saw no strikes by Mr. Andrich or even any punches thrown by him. Yet, both Defendants tased Mr. Andrich in his back. With this in response to a trespass call, all force in the parking lot was unreasonable.

"Resistance, or the reasonable perception of resistance, does not entitle police officers to use *any* amount of force to restrain a suspect." *Banard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013); *see LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) ("if the extent of the injury to [plaintiff's] back is serious enough, a jury could conclude that [the officer] used force in excess of what was reasonable, even if [plaintiff] had been resisting at the time."). The Ninth Circuit "has recognized that an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance.'" *Young*, 655 F.3d at 1164 (quoting *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001)). Since *County of Los Angeles v. Mendez*, 137 S.Ct. 1539 (2017), the Ninth Circuit has reinforced a "jury may consider unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Winkler v. City of Phoenix*, 849 Fed.Appx. 664, 667 (9th Cir. 2021).

Here, assuming there was some resistance by Mr. Andrich in the parking lot, he never struck either Defendant or attempted to do so, and he had his back to Defendants or was on the ground. (Ex. B 47:14-24.) Defendants had no injuries, and Mr. Andrich's fingernails were clean showing a lack of violence by Mr. Andrich. And, the use of closed-fist strikes to Mr. Andrich's head and use of taser is contrary to PPD policy and Defendants' training. (Ex. C 45:13-15; 36:9-13, 48:10-12, 49:15-23; Ex. D 37:22-38:2, 38:13-39:11.) Simply, Defendants' use of force in the parking lot was excessive.

With deadly force, pursuant to *Bryan v. McPherson*, 630 F.3d 805 (9th Cir. 2010), the most important *Graham* factor is whether Mr. Andrich posed an immediate threat to the safety of Officer Kostas, as Officer Peters and bystanders were not claimed to be in immediate danger. *Id.* at 826; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020). "First, 'a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'" *Young*, 655 F.3d at 1163 (quoting *Deorle*, *v. Rutherford*, 272 F.3d 1272, 1281(9th Cir. 2001)). "Even when an emotionally disturbed individual is acting out and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Glenn*, 673 F.3d at 876.

On Plaintiff's facts, this was not an immediate defense of life situation, and Officer Kostas' deadly force was excessive and unreasonable. Taking the facts in the light most favorable to Plaintiff, Mr. Andrich was mentally ill and did not injure anyone before he was shot, let alone injure someone with the loose handcuff. It is a reasonable inference that Mr. Andrich was running away from Officer Kostas and swatting his hands away on the southside of Osborn only after Officer Kostas violently assaulted Mr. Andrich by repeatedly striking Mr. Andrich's face and tasing him. On Plaintiff's facts, Mr. Andrich did not make a swinging or lunging motion toward Officer Kostas before being shot. Officer Kostas decided to use deadly force against Mr. Andrich at six

1   seconds in the video when no objective facts justify the use of deadly force. At ten to

2   twelve feet, Mr. Andrich was not close enough to Officer Kostas to strike him.

3     The shooting was excessive and unreasonable even on the undisputed facts, as

4   follows: The officers were not responding to a serious crime. Mr. Andrich had a

5   handcuff attached to his right wrist, not armed with a weapon such as knife or a gun.

6   Mr. Andrich never injured anyone. Mr. Andrich was mentally unstable, injured and

7   bleeding prior to being shot, and he had already been tased twice in the back. Mr.

8   Andrich does not strike or attempt to strike Officer Kostas in any video footage.

9     Other significant factors to consider are the availability of alternative methods to

10  effectuate an arrest or overcome resistance and whether the officer gave a warning that

11  deadly force would be used. *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012);

12  *Bryan,* 630 F.3d at 831; *Headwaters*, 240 F.3d at 1204 ("[P]olice are 'required to

13  consider what other tactics if any were available to effect the arrest.'"); *Graham*, 490

14  U.S. at 396; *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Here, it is

15  undisputed Officer Kostas did not give Mr. Andrich a verbal warning prior to shooting.

16  Additionally, Officer Kostas had reasonable alternative measures other than shooting,

17  including OC spray, taser (which it is not clear that both of Officer Kostas initial taser

18  prongs made adequate contact to be effective), and en route air support, K9 units, and

19  other PPD units. Because the disputed and undisputed facts clearly show that Mr.

20  Andrich did not pose an immediate threat of death or serious bodily injury at the time of

21  the shooting, or at any time, Defendants' motion should be denied.

22     **C.**  **Qualified Immunity Should Be Denied**

23    "Where factual disputes exist in a civil rights action, summary judgment is

24  appropriate only if Defendants are entitled to qualified immunity on the facts as

25  alleged by the nonmoving party." *Blankenhorn*, 485 F.3d at 477. "Qualified immunity

26  should not be granted when other evidence in the record, 'such as medical reports,

27  contemporaneous statements by the officer[,] the available physical evidence, [and]

28  any expert testimony proffered by the plaintiff' is inconsistent with material evidence

proffered by the defendant." *Newmaker*, 842 F.3d at 1116; *Gonzalez*, 747 F.3d at 791. Summary judgment should be denied when "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott*, 39 F.3d at 915; *Hopkins*, 58 F.2d at 888.

Here, qualified immunity should be denied for two reasons. First, factual issues regarding qualified immunity are best resolved by a jury.  *See Smith*, 394 F.3d at 704 n.7 (stating "[w]hether the officers are entitled to qualified immunity may depend in large part on factual determinations the jury will be required to make."); *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) ("genuine disputes [as to qualified immunity] are generally resolved by juries in our adversarial system.").  Where material issues of fact remain, the issue of qualified immunity cannot be resolved on summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Glenn*, 673 F.3d at 870 n.7 (citing *Espinosa,* 598 F.3d at 532); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law [citations] may depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

In this case, there are a number of disputed facts bearing on the reasonableness of Defendants' use of force, deadly and non-deadly, against Mr. Andrich, such that granting qualified immunity at this stage is impossible. *See Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir. 2003) (stating "[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").

Second, Defendants are not entitled to qualified immunity because, taking Plaintiff's facts as true, Defendants' actions constitute a clear departure from established law, as well as their own training. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding the "salient question" is whether the state of the law gave the

1    defendant "fair warning" that his alleged conduct was unconstitutional). Even without

2    a case directly on point, a police department's policies provide "fair notice" of when

3    force is constitutionally excessive. *Drummond*, 343 F.3d at 1061; *Id.* at 1059 ("we

4    may certainly consider a police department's own guidelines when evaluating whether

5    a particular use of force is constitutionally unreasonable.").

6    Here, as Defendants told Det. Winters on the date of the incident, Mr. Andrich

7    was not violently attacking Defendants when coffees were slapped out of his hands

8    and Officer Kostas began using fist strike and knee strikes in the parking lot, which

9    constitutes Defendants' departure from their training and PPD policies. *See Rice v.*

10   *Morehouse*, 989 F.3d 1112, 1125 (9th Cir. 2021) ("we clearly established one's right

11   to be free from the application of non-trivial force for engaging in mere passive

12   resistance"); *Blakenhorn*, 485 F.3d at 481. With Mr. Andrich being tased in the back,

13   he was not displaying an imminent threat to an officer or another, showing a further

14   departure by Defendants to their training and PPD policy. And undisputedly, Officer

15   Kostas did not provide a warning before deadly force was used when Mr. Andrich was

16   ten to twelve feet away, which additionally violates PPD policy. (Ex. K p. 12.)

17   Defendants cannot dispute that the law is clearly established that "the Ninth Circuit

18   had long held that actual warnings are required" before deadly force may be used.

19   *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1006 (D. Ariz. 2012) (citing

20   *Harris*, 126 F.3d at 1201). Additionally, the Ninth Circuit has previously held whether

21   a warning is feasible or not to a suspect yielding a knife six feet away is a jury

22   question. *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1235 (9th Cir. 2013).

23   "While there does not have to be 'a case directly on point,' existing precedent

24   must place the lawfulness of the [conduct] 'beyond debate.'" *Dist. of Columbia v.*

25   *Wesby*, 138 S.Ct. 577, 589 (2018) (quoting *Ashcorft v. al-Kidd*, 563 U.S. 731, 741

26   (2011)). During this incident, it was "clearly established" that "[w]here the suspect

27   poses no immediate threat to the officer and no threat to others, the harm resulting

28   from failing to apprehend him does not justify the use of deadly force to do so."

1   *Garner*, 471 U.S. at 11; *Deorle*, 272 F.3d at 1281. The video depicts no immediate

2   threat to anyone at six seconds, i.e. when Officer Kostas decided to use deadly force.

3   *See Scott*, 550 U.S. at 380-81. Numerous other cases gave Defendants notice that their

4   force was unconstitutional. *See, e.g., Hayes*, 736 F.3d at 1233-34 (finding force

5   unreasonable when a decedent not charging at officers with knife was shot with no

6   warning provided); *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017)

7   (denying qualified immunity when a deputy shot decedent six to eight feet away

8   without warning and non-lethal options were available); *Hughes v. Kisela*, 862 F.3d

9   775 (9th Cir. 2016) *rev'd on other grounds*, 138 S.Ct. 1148 (2018) (reversing only on

10  the grounds that the constitutional right was not clearly established in 2010) (woman

11  holding a knife five to six feet from another did not injure anyone); *Chien Van Bui v.*

12  *City of and Cnty. of San Francisco*, 699 Fed.Appx. 614, 615 (9th Cir. 2017) (denying

13  qualified immunity as decedent was shot as he was turning away from officers with a

14  knife in his hand); *N.E.M. v. City of Salinas* 761 Fed.Appx. 698 (9th Cir. 2019)

15  (denying qualified immunity when a decedent swung garden shears at officers

16  approximately six feet away); *Bascomb v. City of Seattle*, 9 F.3d 1550 (9th Cir. 1993)

17  (decedent "was turning away from the officer and could not have been perceived as a

18  looming threat"); *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (Plaintiff

19  "made no aggressive move of any kind"); *Curnow v. Ridgecrest Police*, 952 F.2d 321,

20  322, 325 (9th Cir. 1991) (denying qualified immunity when a victim who had a gun

21  and not pointing his gun at the officers and was not facing them); *Newmaker*, 842 F.3d

22  at 1116 (Ninth Circuit reversing a district court's granting of  summary judgment

23  based upon qualified immunity because the officers' versions of events changed over

24  time and were contradicted by an autopsy evidence and video evidence).

25       Here, Defendants' version of the event has changed over time and are

26  additionally contradicted by the autopsy report, video of the incident, and two

27  independent witnesses. Regardless, Defendants, who had an obligation to be well-

28  versed in the cases above, should have therefore known that their similar conduct in

this case was unconstitutional. *See Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1382 (9th Cir. 1989); *Ward v. San Diego Cnty.*, 791 F.2d 1329, 1332 (9th Cir. 1986). Accordingly, Defendants are not entitled to qualified immunity.

### D.   Defendants Are Liable For The Denial Of Medical Care

As admitted by Defendants, under the 14th Amendment, an officer must promptly provide medical aid for a suspect that has been injured while being detained. *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006). In *Tatum*, the officer immediately called for an ambulance once seeing the suspect's breathing become labored, indicating distress. *Id.* Here, Defendants conduct departed that of *Tatum*. Defendants violated their own training and PPD policies by not controlling or attempting to stop Mr. Andrich's bleeding for five minutes. Allowing Mr. Andrich to bleed out before any ambulance arrived on scene without any care provided violates the constitution and essentially prevented Mr. Andrich's version of the story from ever being disclosed. This is enough for a constitutional violation as whether Defendants satisfied their constitutional obligation to provide "prompt" medical attention to Mr. Andrich is a jury question.

As for causation, Defendants' motion, without any foundation, mistakenly argues that the CBRE video and an incident report have synced timestamps for reference. There is no proof of such synchronous records. And Plaintiff need not hire a medical expert when the medical examiner opined that Mr. Andrich's chances of survival would have increased with CPR provided. Simply, Defendants failed to provide Mr. Andrich medical care for minimally five minutes in violation of PPD policies. (Ex. H p. 31; Ex. K p. 3.)

## IV.   CONCLUSION

Based upon the foregoing, Defendants' motion should be denied.

Date: December 17, 2021            **THE LAW OFFICE OF KEVIN S. CONLOGUE**
**ACCIDENT FIGHTERS, APC**

By: ____/s/Kevin S. Conlogue_____
Diana Zeesman, Esq.
Kevin S. Conlogue, Esq., Attorneys for Plaintiff

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

Case Name: *Andrich, et al. v. Gus Kostas, et al.*

4

Case No. **2:19-cv-02212-DWL**

5

6

7

I hereby certify that on December 17, 2021, I electronically transmitted the attached

8

document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

9

10

Kathleen L. Wieneke, Esq.
Christina Retts, Esq.

11

WIENEKE LAW GROUP, PLC

12

1095 West Rio Salado Parkway, Ste. 209
Tempe, AZ 85281

13

Email: kwieneke@wienekelawgroup.com, cretts@wienekelawgroup.com

14

15

I certify that **all** participants in the case are registered CM/ECF users and that service

16

will be accomplished by the CM/ECF system.

17

I declare under penalty of perjury under the laws of the State of California the

18

foregoing is true and correct and that this declaration was executed on December 17,

19

2021, at Beverly Hills, California.

20

21

/S/Kevin S. Conlogue

22

Kevin S. Conlogue

23

24

25

26

27

28