**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louise Andrich, | No. CV-19-02212-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Gus Kostas, et al., | |
| Defendants. | |

This lawsuit arises from the fatal shooting of Alexandre Andrich ("Andrich") by Phoenix Police Department ("PPD") Officer Gus Kostas.  Plaintiff is Louise Andrich, who is suing both in her individual capacity as Andrich's sister and as the administrator of Andrich's estate.  Now pending before the Court is a motion for summary judgment filed by Officer Kostas and fellow PPD Officer Brian Peters (together, "Defendants").  (Doc. 86.)  For the following reasons, the motion is granted.

## BACKGROUND

I.    <u>Factual Background</u>

In their motion papers, the parties present sharply different factual accounts of the underlying incident.  Because the summary judgment analysis turns, in significant part, on which version of the facts must be accepted, and because particular care in examining the record is necessary in "cases in which the victim of alleged excessive force has died . . . because the witness most likely to contradict the officers' story is unable to testify," *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (cleaned up), the Court

begins with a detailed summary of the underlying facts, indicating as appropriate where one side's version of the facts need not be credited.

For purposes of this factual summary, all legitimate disputes of fact have been resolved in Plaintiff's favor as the non-movant.  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("The court views the evidence in the light most favorable to the non-moving party to determine if there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.  The court draws all justifiable inferences in favor of the non-moving party.") (citation omitted).  However, because Defendants have submitted video and audio footage of the incident (Docs. 88, 101), the Court need not accept Plaintiff's version of the facts to the extent it is clearly contradicted by that footage.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) ("[W]e do not accept a non-movant's version of events when it is clearly contradicted by a video in the record.") (cleaned up).

## A.     **Evidentiary Objections**

As an initial matter, Plaintiff objects to one of Defendants' proffered pieces of audio footage (defense exhibit 12, a recording of a radio transmission during the incident), as well as one of Defendants' other exhibits (defense exhibit 13, additional pages of a witness's deposition testimony), on timeliness grounds, arguing that Defendants should have filed these exhibits as attachments to their motion and instead improperly filed them as attachments to their reply.  (Doc. 96 at 1-2.)  Alternatively, Plaintiff argues that Exhibit 12 "is unintelligible and lacks foundation" and Exhibit 13 "is incomplete and violates Federal Rule of Evidence 106."  (*Id.*)

These objections are unavailing.  Because Exhibits 12 and 13 address arguments raised in Plaintiff's response brief, it was permissible for Defendants to attach them as exhibits to their reply.  *See, e.g.*, *TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1

(D. Ariz. 2014) ("While a party may not file 'new' evidence with a reply, it may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition. . . .   District of Arizona precedent is clear . . . that it is immaterial that [the movant] already had this evidence in its possession at the time it filed its motion for summary judgment, so long as it is rebuttal evidence."); *E.E.O.C. v. Creative Networks, LLC & Res-Care, Inc.*, 2008 WL 5225807, *2 (D. Ariz. 2008) (acknowledging that "a party may not file 'new' evidence with a reply and then deprive the opposing party of an opportunity to respond to the new evidence" but holding that evidence attached to reply was "proper" because it merely "rebut[ted] arguments first raised by Plaintiff").

Turning specifically to Exhibit 12, Defendants have laid an adequate foundation for it in light of (1) their earlier submission of the CAD Report (Doc. 86-2 at 39-74); (2) Plaintiff's lack of objection to the CAD Report; and (3) Exhibit 12's distinctive characteristics and consistency with the CAD Report and other evidence in the record. *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) ("At summary judgment, 'a party does not necessarily have to produce evidence in a form that would be admissible at trial.'") (citation omitted); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532-34 (9th Cir. 2011) (summary judgment exhibits may "be authenticated by their distinctive characteristics under Federal Rule of Evidence 901(b)(4)").   The Court also notes that Plaintiff does not develop any reasoned argument why Exhibit 12 should be considered *in*authentic (Doc. 96 at 2 [entirety of argument is "Exhibit 12 is unintelligible and lacks foundation"]) and did not deny the authenticity of Exhibit 12 in response to one of Defendants' requests for admission (Doc. 97 at 2 n.1).   These circumstances amplify why it would be improper to sustain the authenticity objection here.   *Cf. Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (district court erred by sustaining "unexplained generalized objections" to summary judgment evidence).   Finally, Plaintiff's contention that Exhibit 12 is "unintelligible" is not only inaccurate (as discussed in more detail below) but is not a valid evidentiary objection at summary judgment.

As for Exhibit 13, although the Court does not necessarily agree with Plaintiff's

contention that it violates the rule of completeness, Plaintiff acknowledges that any violation could be cured by considering the additional pages of the witness's deposition transcript that Plaintiff filed as an exhibit to her objections. (Doc. 96 at 2.) The Court will consider those additional pages (Doc. 96-1) for purposes of its analysis.

### B.   The Night Before The Incident

On the evening of June 11, 2018, non-party PPD officers were called to the Extended Stay America hotel in central Phoenix by manager Ryan Dickerman. (Doc. 86-2 at 7-8.) Dickerman informed the officers that Andrich had violated the hotel's no-smoking policy and, when staff "attempted to inform [Andrich] of this policy infraction," Andrich responded by engaging in "irate actions," including slamming the door shut in staff members' faces and causing the door latch to be ripped off the door. (*Id.*) Dickerman also told police that Andrich was involved in an incident two days earlier in which he threatened another guest, stating "I'll kill you." (*Id.* at 8.)

Upon making contact with Andrich, the officers noted he was "very irate" and appeared to be "under the influence of drugs or alcohol, or suffered from an unknown mental illness." (*Id.*) After the officers failed to lure Andrich out of his room, they called a Crisis Intervention Team ("CIT"). (*Id.*) Members of the CIT negotiated with Andrich for over 90 minutes, but Andrich refused to leave his room and eventually barricaded the door with furniture. (*Id.*) "At no time did [Andrich] make statements about self-harm or harming others." (*Id.*) The CIT left without making face-to-face contact with Andrich. (*Id.*) Dickerman was "led to believe that [he] could just pick up the phone at any time once [he] saw [Andrich] leave the room, and the Phoenix police force in th[e] area would be able to respond immediately and know what[] [was] going on." (Doc. 89-2 at 35.)

### C.   The Incident

On the morning of June 12, 2018, Defendants responded to a trespassing call at the Extended Stay America. (Doc. 86-2 at 13-15.) At some point that morning, Dickerman had locked himself, his staff, and guests in a laundry room because he believed Andrich was "upset about something and coming back to the hotel" and was "unpredictable." (*Id.*

at 79-80.)  The dispatcher informed Defendants that Andrich was "a suspect who returned to the hotel who was . . . trespassing the night before," that the "incident the night before" involved "some type of criminal damage," and that Andrich was acting "kind of agitated." (*Id.* at 14.)

Officer Peters made first contact with Andrich as Andrich was walking along Osborn Road toward Central Avenue.  (*Id.* at 15.)  In response, an "agitated" Andrich "basically said, don't talk to me . . . [and] then he said, fuck you."  (*Id.* at 16.)  Officer Peters told Andrich not to go back to the hotel, at which point Andrich began to walk toward the light rail.  (*Id.* at 16-17.)  Believing Andrich had "gotten the message" not to return to the hotel, Officer Peters joined Officer Kostas in the parking lot of the hotel to discuss the situation.  (*Id.* at 17-18.)

While Defendants were discussing what to do, they received a dispatch that Andrich had returned to the hotel.  (Doc. 89-2 at 228.)  In response, Officer Peters entered the hotel lobby while Officer Kostas remained in his vehicle to research what had happened the night before.  (*Id.* at 229.)  At this time, Defendants did not discuss a plan to detain or arrest Andrich.  (*Id.* at 82, 86.)

When Officer Peters asked Andrich what he was doing at the hotel, Andrich "basically told [Officer Peters] to fuck off, and he yelled at [Officer Peters] to stop talking to him, that [Officer Peters] can't tell him what to do.  And [Officer Peters] said, well, we're going to have to go out away from here because you're in the lobby of this place and they don't want you here."  (*Id.* at 230.)  Andrich complied, walking to the parking lot with two cups of coffee in his hands.  (*Id.*)  However, after exiting, Andrich continued "screaming and yelling and being really agitated."  (*Id.* at 230-31.)

In the parking lot, Officer Kostas spoke with Andrich, saying "[w]ords to the effect of, you can't trespass, we need to talk about this, you need to stop."  (*Id.* at 163.)  In response, Andrich refused to stop moving.  (*Id.*)  Officer Kostas then repeated the instruction to stop, but Andrich again refused to stop and kept moving.  (*Id.*)  At some point in this sequence, Officer Peters advised Andrich that "due to the circumstances that you

came back after being ordered to leave, we're going to detain you and figure this out." (*Id.*at 231.)

At this point in the encounter, Officers Peters and Kostas "almost simultaneously" initiated physical contact with Andrich.  (*Id.* at 163-64.)  They began by slapping the cups of coffee out of Andrich's hands.  (*Id.*)[1]  Next, each officer took hold of one of Andrich's arms.  (*Id.* at 162-63 [Officer Kostas's account]; *id.* at 231 [Officer Peters's account].)  As Defendants were attempting to place Andrich's wrists behind his back so he could be handcuffed, Andrich physically resisted.  (*Id.* at 166, 231.)  According to Officer Peters, Andrich "was so strong that it just almost turned into him shaking us off like rag dolls. . . . [H]e was uncontrollable at that point."  (*Id.* at 232.)  Similarly, Dickerman, who was watching the encounter through a window in his office within the hotel, testified that as the officers were trying to get "Andrich to put his arms behind him," Andrich "had, like, superhuman strength" and "was able to fight them off quite well. . . . It was just . . . a brawl on the ground where these two officers could not get a hold of one person."  (*Id.* at 39-40.)

At the moment Andrich began resisting, Officer Peters told him he was under arrest.  (Doc. 86-2 at 93.)[2]  After Officer Peters used leg sweeps to get Andrich onto the ground (Doc. 89-2 at 170, 235), Officer Kostas was able to place a handcuff on Andrich's right wrist but not on the left (*id.* at 39, 166).  During this portion of the encounter, Officer Kostas repeatedly hit Andrich with closed-fist hand strikes and knee strikes.  (*Id.* at 167-69 [Officer Kostas, admitting that he punched Andrich six to eight times before they went to the ground, that he threw the first punch, and that he also used knee strikes].)  *See also*

---

[1]    Although Officer Peters testified that Andrich "started making movements like he was going to throw the coffee on me or Officer Kostas" (Doc. 89-2 at 231), Officer Kostas testified that Andrich "never made any threatening motions with those cups of coffee" (*id.* at 189).  Thus, for summary judgment purposes, the Court accepts that Andrich never threatened to throw the coffee and disregards the assertions in Defendants' motion (Doc. 86 at 8) to the contrary.

[2]    Plaintiff notes in her response brief that Officer *Kostas* did not tell Andrich he was under arrest.  (Doc. 89 at 4.)  This is correct (Doc. 89-2 at 192) but irrelevant—Officer *Peters* testified that he told Andrich he was under arrest at the moment Andrich began resisting (Doc. 86-2 at 93), Plaintiff does not identify any evidence in the record to contradict this testimony, and Exhibit 12—the audio recording that Defendants submitted with their reply—clearly reflects a speaker saying "You're under arrest" at the 15:57 mark.

*id.* at 39-41 [Dickerman, testifying that one of the officers punched Andrich]; *id.* at 234 [Officer Peters, testifying that Officer Kostas punched Andrich].)  In contrast, Andrich did not throw any punches.[3]

The initial scuffle on the ground was "very short-lived" because Andrich was able to get back on his feet "pretty quickly." (*Id.* at 172.)  Officer Kostas also stood up and threw a "flurry" of additional punches at Andrich. (*Id.* at 173-74.)  At least three of Officer Kostas's punches connected, causing blood to come out of Andrich's nose and mouth. (*Id.*)  Andrich did not throw any punches at Officer Kostas during this portion of the encounter.[4]

At this point in the encounter, Officer Peters told Officer Kostas to stop punching Andrich. (*Id.* at 174-75.)  Officer Kostas complied and stepped away so that Officer Peters could deploy a Taser. (*Id.* at 175-76.)  The Taser hit Andrich in the back. (*Id.* at 311-12.)[5] After being hit, Andrich fell to the ground, let out an "angry" scream that was "a yelling scream [more] than an ow-y scream," and quickly "pulled the prongs out and was back on

---

[3]    Although Defendants both testified that Andrich attempted to punch or strike them during this portion of the encounter (Doc. 89-2 at 166, 234), Dickerman testified that he did not observe Andrich striking or punching Defendant (*id.* at 40, 47, 49). Via Exhibit 13, Defendants attempt to show that Dickerman's testimony on this point was equivocal (Doc. 93-2), but a reasonable juror could conclude, based on the surrounding pages of Dickerman's deposition testimony that Plaintiffs filed in response to Exhibit 13, that Dickerman ultimately did not withdraw his contention that Andrich threw no punches (Doc. 96-1 at 3).   Additionally, although Defendants identify portions of Dickerman's testimony that suggest he may not have seen the entirety of the encounter (Doc. 89-2 at 37 ["I saw a struggle . . . and I don't know what led up to it to get to that point."]), Dickerman testified elsewhere that he saw the encounter from the moment Defendants began attempting to place Andrich's arms behind his back so he could be handcuffed (Doc. 89-2 at 39, 47). Construed in the light most favorable to Plaintiff, a reasonable juror could thus conclude that Dickerman saw the entire portion of the encounter during which Defendants contend that Andrich was throwing punches (and contradicted Defendants' account on that point). Thus, for summary judgment purposes, the Court accepts that Andrich did not throw any punches and disregards the assertions in Defendants' motion (Doc. 86 at 3, 9) to the contrary.

[4]    As discussed in the previous footnote, although Defendants have presented evidence that Andrich was throwing punches, this evidence must be disregarded for summary judgment purposes in light of Plaintiff's submission of conflicting evidence that Andrich never threw any punches.

[5]    Although Defendants both testified that Officer Peters's Taser hit Andrich in the chest (Doc. 189-2 at 176, 241), the report from the medical examiner states that Andrich's Taser wounds and barbs were "in a triangular pattern that is centered on the midline of the back" (*id.* at 310-11).  Thus, for summary judgment purposes, the Court accepts that Officer Peters's Taser hit Andrich in the back.

his feet like a cat." (Doc. 86-2 at 35.)  As Dickerman testified: "I do remember for sure Mr. Andrich not even, like, being fazed by it, pulling the leads from the Taser, like, out of him and kind of just, like, walking away briskly." (Doc. 89-2 at 39.)

In response, Officer Kostas deployed his Taser. (*Id.* at 42-43, 242.)  It hit Andrich in the back as he was walking away from Defendants. (*Id.* at 42.)  Andrich "grunted and continued to scream and yell and [again tried] to . . . walk away." (*Id.* at 243.)

Officer Kostas pursued Andrich on foot. (*Id.* at 43, 179, 243.)  Officer Peters, who did not join the pursuit due to a knee injury sustained during the earlier scuffle, got on the radio to report an aggravated assault on police officers and to request an air unit or K-9 support. (*Id.* at 179.)

Much of the controversy in this case turns on what happened next.  As noted, a handcuff was fastened around Andrich's right wrist during the initial portion of the encounter, but the other cuff was never fastened around his left wrist—instead, it remained loose and unfastened.  Officer Kostas testified that as he encountered Andrich on Osborn Road, Andrich had "manipulated" the dangling portion of the handcuff "into a weapon," with the "sharp portion of the handcuff . . . threaded between his fingers." (Doc. 86-2 at 105.)  Officer Kostas also testified that, during his police training, he had received instruction "about the dangers of a dangling handcuff," namely that "[i]t could be used as a weapon against the officer if they're allowed to get in the hands of a suspect without being properly secured.  And the ones with strands are sharp and made up of jagged [steel] . . . teeth." (*Id.* at 104.)

Officer Kostas testified that as he approached Andrich on Osborn Road, Andrich "lunged" at him with the fist holding the dangling handcuff. (Doc. 89-2 at 115-16.)  Andrich was about 10-12 feet away from Officer Kostas at the time. (*Id.* at 269.)[6]  In response, Officer Kostas raised his service weapon and shot Andrich. (*Id.*)  Officer Kostas

---

[6]       Although Officer Kostas testified during his deposition that Andrich was about 6-8 feet away from him at the time (Doc. 89-2 at 118), Officer Kostas provided an estimate of 10-12 feet during a "walk-through interview" with a police investigator (*id.* at 269).  Thus, for summary judgment purposes, the Court accepts that Andrich was 10-12 feet away from Officer Kostas.  This estimate is not clearly contradicted by the video footage.

did not provide a verbal warning before shooting.  (*Id.* at 109.)  Officer Kostas testified that he discharged his weapon because he feared for his own safety—"[h]ad [Andrich] incapacitated me or injured me with the cuff, I could have fallen, maybe even gone unconscious, and then would have no control over my pistol." (Doc. 86-2 at 106.  *See also* Doc. 89-2 at 108 [fearing "[t]hreat of serious injury, incapacitation, permanent disfigurement"].)

Notably, although the earlier portions of the encounter between Andrich and Defendants were not caught on videotape—and thus the factual summary provided above is derived from the testimony of Defendants and eyewitness Dickerman and the snippets of audio footage that are available—the final sequence was captured on a cell phone video taken by a bystander.  That video footage, which was enclosed as Exhibit 9 to Defendants' motion, corroborates in all material respects Officer Kostas's testimony regarding this portion of the encounter.

For example, a screenshot of the video at the 0:06 mark shows Officer Kostas attempting to speak with Andrich as Andrich walks away:



However, at the 0:07 mark, Andrich stops walking, turns, raises his right hand (the one with the dangling cuff),[7] and moves the hand toward Officer Kostas:



Immediately afterward, at the 0:08 mark, Officer Kostas raises his weapon and shoots:



---

[7]     Although the screenshot appears to show Andrich raising his left hand, the bystander was taping the reflection of the encounter that appeared on the side-door mirror of his car. Thus, the images are reversed.

- 10 -

Given this unambiguous video evidence, the Court need not accept Plaintiff's contention that, "[o]n Plaintiffs' facts, Mr. Andrich did not make a swinging or lunging motion toward Officer Kostas before being shot." (Doc. 89 at 15.) As noted, a court need "not accept a non-movant's version of events when it is clearly contradicted by a video in the record." *Hernandez*, 989 F.3d at 743 (cleaned up).[8] Here, although it might be possible to have a semantic debate over whether the movement of Andrich's hand (with the dangling cuff threaded through his fingers) toward Officer Kostas was emphatic enough to qualify as a "lunge" or a "swing," it is beyond legitimate dispute that Andrich stopped, raised his hand, and quickly moved his hand toward Officer Kostas immediately before the shooting.

D.   **After The Incident**

Within a few seconds of when the shot was fired, Defendants placed a "998 call"—that is, a report of an officer-involved shooting—on the police radio. (Doc. 86-2 at 94, 107.) Records indicate this call occurred at 7:45:33 AM. (*Id.* at 109.) At 7:46:15—that is, less than a minute later—emergency medical personnel were dispatched to the scene. (*Id.*) They arrived at 7:50:13, which was less than five minutes after the initial 998 call. (*Id.*)

As Defendants were waiting for emergency medical personnel to arrive, they "prevented traffic from running [Andrich] over by standing in front of him and directing traffic away." (Doc. 89-2 at 248; *see also* Doc. 86-2 at 38.)[9] However, neither Defendant performed CPR or any other "hands-on life saving measures." (Doc. 89-2 at 45-46 [Dickerman]; *id.* at 248-49 [Officer Peters].)[10]

---

[8]   For related reasons, it is irrelevant that, during an interview with a police investigator, "Officer Kostas did not tell Det. Winter that Mr. Andrich swung his handcuff[ed] arm at Officer Kostas before he shot." (Doc. 89 at 7, citing Doc. 89-2 at 277-78.) As noted, the video footage clearly shows Andrich raising his hand and moving it toward Officer Kostas.

[9]   Exhibit 11 to Defendants' motion, which is a surveillance video from a nearby business establishment, depicts the conduct of Defendants following the shooting. It is consistent with their testimony that they redirected traffic around Andrich as he lay on the ground. This video does not depict the shooting itself—instead, Andrich is seen walking onto the screen, and then collapsing to the ground, after he had been shot off-screen. Thus, Exhibit 11 sheds no light on the circumstances of the shooting itself.

[10]   Although Officer Kostas testified that he began performing chest compressions on Andrich about five minutes after the shooting, just before emergency medical personnel

1    Andrich was transported to a local hospital at approximately 8:00 AM.  (Doc. 86-2
2    at 113-14.)  The medical notes indicate that he had "no pulse on arrival" and had "been
3    coded for 10 minutes prior to his arrival."  (*Id.*)  After various life-saving measures proved
4    ineffective, Andrich was declared dead at approximately 8:16 AM.  (*Id.*)

5    II.    Procedural History

6          On April 4, 2019, Plaintiff initiated this action by filing a complaint.  (Doc. 1.)

7          On June 24, 2019, Plaintiff filed a First Amended Complaint ("FAC").  (Doc. 18.)

8          On July 8, 2019, Defendants filed a motion to dismiss the FAC.  (Doc. 26.)

9          On January 23, 2020, the Court granted in part and denied in part Defendants'
10   motion to dismiss the FAC.  (Doc. 29.)

11         On January 31, 2020, Plaintiff filed the operative Second Amended Complaint
12   ("SAC").  (Doc. 31.)

13         On February 14, 2020, Defendants filed a motion to dismiss the SAC.  (Doc. 33.)

14         On July 1, 2020, the Court granted in part and denied in part Defendants' motion to
15   dismiss the SAC.  (Doc. 36.)  Former Defendant City of Phoenix was terminated in
16   accordance with this order.

17         On November 22, 2021, Defendants filed the pending motion for summary
18   judgment.  (Doc. 86.)  The motion is now fully briefed (Docs. 89, 93, 94, 95, 97) and
19   neither side requested oral argument.

**DISCUSSION**

20   I.    Legal Standard

21         "The Court shall grant summary judgment if [a] movant shows that there is no
22   genuine dispute as to any material fact and the movant is entitled to judgment as a matter
23   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

---

25   arrived (Doc. 189-2 at 93), Dickerman testified that he never saw "either one of the two
26   original officers . . . provide any CPR" (*id.* at 46).  Thus, for summary judgment purposes,
     the Court accepts that Defendants did not perform CPR or any other hands-on life-saving
27   measures on Andrich and disregards the assertions in Defendants' briefs (Doc. 86 at 19;
     Doc. 93 at 12 ["Notably, Plaintiff cites no evidence to contradict the testimony of Officer
28   Kostas that he began performing life-saving measures prior to the arrival of medical
     personnel."]) to the contrary.

the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors*, 771 F.3d at 1125.  The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*  There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.     Count One: Excessive Force

        A.     **The Parties' Arguments**

        In Count One of the SAC, Plaintiff asserts a § 1983 claim premised on the theory that Defendants violated Andrich's Fourth and Fourteenth Amendment right to be free from the excessive use of force.  (Doc. 31 ¶¶ 31-40.)[11]

        Defendants contend they are entitled to summary judgment on Count One.  (Doc. 86 at 5-18.)  Their argument has three interrelated parts.  First, Defendants contend their use of non-lethal force against Andrich during the initial portion of the encounter was constitutional because (1) they had probable cause to arrest Andrich for trespass, (2) they were entitled to use at least some force to effect an arrest, (3) Andrich began resisting arrest, placing their safety at risk, and (4) "[m]ultiple alternative uses of force—command presence, verbal commands, soft-empty hand techniques, hard empty hands, physical grappling, and Taser—were unsuccessful to take [Andrich] into custody," requiring increased uses of force.  (*Id.* at 1, 5-10.)  Second, Defendants contend that Officer Kostas's use of deadly force was constitutional because "Andrich had repeatedly assaulted two police officers and was fleeing the scene towards a public area, including a light rail stop, where innocent civilians were congregating.  He manipulated a sharp handcuff into a weapon.  He ignored warnings from Officer Kostas to stop.  It was only after Andrich turned and swung the dangler at Kostas that Kostas fired his weapon.  Considering the totality of the circumstances, Officer Kostas' decision to employ deadly force was reasonable."  (*Id.* at 10-12.)  Third, at a minimum, Defendants contend they are entitled to qualified immunity.  (*Id.* at 12-18.)  On that point, as for the use of non-lethal force, Defendants contend that no case "provide[d] notice to Officers Peters and Kostas" that it would be unconstitutional to use force against a suspect who "refused to leave a hotel, returned, resisted arrest, and the[n] physically assaulted officers" and who "was not known

---

[11]     Although Count One also includes an assertion that Defendants violated Andrich's "right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments" (Doc. 31 ¶ 33), both sides only construe Count One as an excessive force claim in their summary judgment briefing.

to the officers, was verbally abusive, and [whose] behavior evidenced defiance, not compliance." (*Id.* at 12-14.)  As for Officer Kostas's use of lethal force, Defendants contend "[t]here is no case, from the Ninth Circuit or Supreme Court, addressing facts analogous to those faced by these responding officers: a suspect, exhibiting superhuman strength, who actively resisted arrest, assaulted officers, and then fled on foot armed with a handcuff, which he raised in a hostile manner towards Officer Kostas." (*Id.* at 13.) Defendants also argue that the Ninth Circuit and Supreme Court have repeatedly granted requests for qualified immunity in cases involving analogous facts. (*Id.* at 15-18 ["The Supreme Court's *Kisela* and *Booth* decisions, and the Ninth Circuit's *Liberti*, *Woodward*, *Isayeva*, and *Easley* decisions furnish ample, independent legal grounds to grant qualified immunity."].)

In response, Plaintiff begins by identifying various ways in which the video recordings, the testimony of witnesses Dickerman and McGee, and Defendants' statements to Detective Winter during the walkthrough interview contradict Defendants' version of the incident. (Doc. 89 at 1-10.)  Plaintiff also identifies various reasons why Defendants' conduct during the incident was contrary to the internal policies of the PPD (*e.g.*, no verbal warning before shooting, use of closed-fist strikes without a precipitating violent attack, failure to turn on body camera) and/or constituted "poor tactical decision[s]." (*Id.* at 10-11.)  With this backdrop in mind, Plaintiff first argues that Defendants' use of non-lethal force during the initial portion of the encounter was unconstitutional because there was no need for the use of *any* force to arrest Andrich: "Defendants began the assault in the parking lot by knocking the coffee out of Mr. Andrich's hands after he complied with their orders. Officer Kostas's own admission was that he began punching and striking Mr. Andrich when Mr. Andrich was not punching anyone or even attempting to do so.  Mr. Dickerman indicated in the parking lot that Mr. Andrich's back was to Defendants or he was on the ground, suggesting Mr. Andrich was not acting aggressively to Defendants.   Mr. Dickerman saw no strikes by Mr. Andrich or even any punches thrown by him.  Yet, both Defendants tased Mr. Andrich in his back.  With this in response to a trespass call, all force

in the parking lot was unreasonable." (*Id.* at 14-15.)  Next, Plaintiff argues that Officer Kostas's use of deadly force was unreasonable because "this was not an immediate defense of life situation. . . .  Mr. Andrich was mentally ill and did not injure anyone before he was shot, let alone injure someone with the loose handcuff.  It is a reasonable inference that Mr. Andrich was running away from Officer Kostas and swatting his hands away on the southside of Osborn only after Officer Kostas violently assaulted Mr. Andrich by repeatedly striking Mr. Andrich's face and tasing him.  On Plaintiff's facts, Mr. Andrich did not make a swinging or lunging motion toward Officer Kostas before being shot.  Officer Kostas decided to use deadly force against Mr. Andrich at six seconds in the video when no objective facts justify the use of deadly force.  At ten to twelve feet, Mr. Andrich was not close enough to Officer Kostas to strike him." (*Id.* at 15-16.)  Finally, Plaintiff argues that qualified immunity is unavailable because (1) there are too many unresolved disputes of fact and/or (2) an array of Ninth Circuit cases clearly establish that it is unconstitutional to use non-trivial force against a suspect who is only passively resisting arrest, to use deadly force without providing a warning, and/or to use deadly force when the suspect does not pose an immediate threat.  (*Id.* at 16-20.)

In reply, Defendants begin by reasserting that their use of force was constitutional.  (Doc. 93 at 1-7.)  Defendants note that Plaintiff does not contest their description of the situation the night before at the Extended Stay or Andrich's mental health history, which corroborates Defendants' version of events—that is, Andrich refused to comply with lawful orders, violently resisted arrest, and posed an immediate threat to the safety of Officer Kostas at the time of the shooting.  (*Id.* at 2-3.)  Defendants also reassert that the right to make an arrest necessarily comes with the right to use some physical force—here, knocking the hot coffee out of Andrich's hands and attempting a wrist lock to place handcuffs on him.  (*Id.* at 3.)  As for Plaintiff's contention that Officer Kostas didn't tell Andrich he was under arrest at any time, Defendants argue this is misleading because (1) Officer Peters first advised Andrich he would be detained and then, after Andrich began fighting, told Andrich was under arrest, (2) Officer Kostas testified that his intention was

to detain Andrich about the trespassing, and the act of putting his hands on Andrich was to effect an arrest, even if he didn't directly state this, and (3) the police radio transmission reveals that Andrich was indeed told he was under arrest.  (*Id.* at 4.)  As for Plaintiff's suggestion that Andrich wasn't acting aggressively based on Dickerman's testimony, Defendants argue that Dickerman couldn't say with certainty that Andrich never threw a punch, and even assuming Andrich was on the ground or facing away from Defendants at some point, no case holds that such conduct means Andrich never acted aggressively.  (*Id.* at 4-5.)  As for the pre-shooting verbal warning, "[Officer] Kostas testifie[d] that he told Andrich to 'lower your hands, sit down, stop, stop' after unholstering his weapon and pointing it at Andrich," which served as a warning.  (*Id.* at 6.)  As for the availability of a lesser type of force, Defendants argue that "the entire course of the altercation between Andrich and Defendants established that multiple lesser uses of force—wrist locks, leg sweeps, fist strikes, and taser deployments—were unsuccessful in effectuating an arrest or overcoming Andrich's resistance" and officers are "not required to use the least intrusive degree of force possible."  (*Id.* at 6-7.)  Alternatively, Defendants argue that Plaintiff's qualified-immunity arguments are unavailing because (1) even if some of their conduct was contrary to PPD policy, "a violation of department policy . . . does not itself prove a constitutional violation"; and (2) the cases cited by Plaintiff are factually distinguishable.  (*Id.* at 7-11.)

2.  <u>Analysis</u>

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his

conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted). "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See also Orn*, 949 F.3d at 1174 ("We have the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step."); *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) ("If indeed the [Defendants] did not violate clearly established law, then we can determine that qualified immunity is appropriate and may thus dispose of the case without undertaking an analysis of whether a constitutional violation occurred in the first instance."). Here, the Court chooses to begin—as the parties do—by analyzing the first prong.

### a.  **Excessive Force—Merits**

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). When evaluating the totality of the circumstances, courts must "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'" *Id.* (citation omitted). "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade

arrest by flight.  Where these interests do not support a need for force, *any* force used is constitutionally unreasonable."  *Id.* (citations and internal quotation marks omitted).  "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Id.* (citation and internal quotation marks omitted).

i.  Non-Lethal Force

When evaluating the reasonableness of Defendants' use of non-lethal force, it is helpful to break the initial portion of the encounter into three stages.

The first stage occurred when Defendants slapped the coffee cups out of Andrich's hands and grabbed Andrich's wrists in an attempt to handcuff him.  This initial use of force was reasonable.  It is undisputed that, at the time, Defendants had probable cause to arrest Andrich for the crime of trespassing.  Although this is a fairly minor crime in the overall scheme of things, Defendants still had the right to use some force to effectuate the arrest. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Shafer v. City of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("Shafer's primary argument on appeal is that Deputy Padilla . . . had no basis for using *any* force whatsoever.  We disagree. . . .  Deputy Padilla had probable cause to arrest Shafer for violations of California Penal Code section 148 for resisting, delaying, or obstructing an officer.  This entitled Deputy Padilla to use *some* degree of force.").  Even accepting that Andrich never threatened to throw the coffee cups at Defendants—and thus slapping the cups of out his hands may have been unnecessary when viewed in hindsight— Defendants' attempt to grab Andrich's wrists so they could handcuff him was reasonable and constitutionally permissible.

The cases cited by Plaintiff in support of her contention that "when there is no need for force, *any* force used is constitutionally unreasonable" are distinguishable because they did not involve situations in which police officers had probable cause to effectuate an arrest

and merely grabbed the suspect's wrists in an attempt to handcuff him.  Indeed, in one of those cases, the officers' use of force—gang-tackling a non-violent suspect where the only alleged crime was "misdemeanor trespass"—was deemed excessive in part because they "never tried to handcuff [the plaintiff] . . . before [they] gang-tackled him." *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007).  Here, Defendants did not skip this initial, reasonable step in the arrest sequence.[12]

The second stage occurred when, after Andrich physically resisted Defendants' attempt to handcuff him, Defendants responded by employing more intrusive forms of force.  As noted in the factual summary appearing at the beginning of this order, the relevant sequence (construed in the light most favorable to Plaintiff) is as follows: (1) Andrich resisted Defendants' attempts to handcuff him by "shaking [them] off like rag dolls" and using "uncontrollable" and "superhuman strength" to "fight them off"; (2) immediately after Andrich began resisting, Officer Peters told him he was under arrest; (3) in response to Andrich's initial acts of physical resistance, both Defendants used more intrusive forms of force in an attempt to get Andrich onto the ground—Officer Kostas repeatedly punched Andrich in the face with closed-fist hand strikes and also engaged in knee strikes, even though Andrich was not throwing any punches in return, while Officer Peters performed a series of leg sweeps; (4) once the leg sweeps caused Andrich to go to the ground, Officer Kostas placed a handcuff on one of Andrich's wrists; (5) Andrich then got to his feet "pretty quickly"; and (6) after Andrich got up, Officer Kostas threw another

---

[12]     As for the other cases cited by Plaintiff, *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185 (9th Cir. 2000), is distinguishable because it involved the use of pepper spray on "nonviolent" protestors where "the only crime the protesters had committed when pepper-sprayed was trespass." *Id.* at 1204.  In *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) (en banc), the challenged use of force was an officer's pointing of his firearm at an infant during a warrantless search of a parolee's house. *Id.* at 1088-89.  In *Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001), the challenged use of force was the officer's "purposeful sexual verbal and physical predation against a handcuffed arrestee." *Id.* at 881.  Finally, *P.B. v. Koch*, 96 F.3d 1298 (9th Cir. 1996), did not involve a police officer or an attempt to effectuate an arrest—there, a high school principal was "not . . . acting in a disciplinary role but rather engaging in an arbitrary assault" when he was "slapping, punching, and choking" various students. *Id.* at 1303-04 & n.4.  None of these cases remotely stands for the proposition that an officer violates the Constitution's prohibition against the use of excessive force by attempting to handcuff a suspect whose arrest is supported by probable cause and grabbing the suspect's wrists in the course of the handcuffing attempt.

1    "flurry" of punches at him, even though Andrich was again not throwing any punches in

2    return.

3          Because Andrich engaged in active, aggressive physical resistance in response to

4    Defendants' initial attempt to handcuff him—using "superhuman strength" to shake off

5    two adult police officers "like rag dolls" can hardly be characterized as passive resistance—

6    Defendants were entitled to use increased force in order to protect themselves and complete

7    the arrest.  *See, e.g.*, *Blankenhorn*, 485 F.3d at 479 ("[T]he Fourth Amendment permits

8    police officers to use some force to overcome resistance to being arrested."); *Arpin v. Santa*

9    *Clara Valley Transp. Agency*, 261 F.3d 912, 918, 921-22 (9th Cir. 2001) (rejecting

10   excessive force claim where the officer "attempted to handcuff" the plaintiff for

11   committing a suspected misdemeanor offense, the plaintiff responded by "stiffen[ing] her

12   arm and attempt[ing] to pull free," and the officer responded by "twisting [the plaintiff's]

13   left arm behind her with enough force to lift her off the ground and break her watch band,"

14   because once the plaintiff "failed to cooperate and stiffened her arm when being

15   handcuffed," the officer was justified in "us[ing] additional force").  Additionally, by this

16   point in the encounter, Defendants had probable cause to arrest Andrich for more serious

17   crimes than the misdemeanor trespassing offense that justified their initial arrest attempt—

18   Defendants argue (Doc. 86 at 6), and Plaintiff does not dispute, that Andrich's resistance

19   created probable cause to arrest him for an array of additional crimes under Arizona law.

20   It must also be noted that Defendants were dealing with an agitated suspect who was

21   behaving erratically, that Andrich had already disobeyed earlier instructions (including the

22   instruction not to return to the hotel), that Andrich had been explicitly advised he was under

23   arrest, and that Defendants were aware of the previous night's incident in which CIT had

24   to be called to the hotel while Andrich barricaded himself in a room.[13]

25   _____

     [13]      Defendants contend that the reasonableness of their "perception that Andrich was
26   an immediate threat to their safety and to any civilians in the area" is bolstered by Andrich's
     medical and mental health records (which reflect "numerous instances of sociopathic
27   behavior, a threat to throw hot coffee on security staff, threats of mortal violence against
     family and mental health providers, and homicidal ideation") and by a report of an April
28   2018 incident in which Andrich made death threats and engaged in erratic behavior.  (Doc.
     83 at 7.)  The Court finds it unnecessary to decide whether the medical records and the
     April 2018 incident, which weren't subjectively known to Defendants at the time of the

For these reasons, the Court has little trouble concluding that, if the force utilized during the second stage of the encounter only included leg sweeps to get Andrich onto the ground and grappling with Andrich while on the ground in an attempt to handcuff him, the force would be constitutionally permissible.  By this point in the encounter, all three of the relevant factors for assessing the government's interest in the use of force—the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers, and whether the suspect was actively resisting arrest—supported that interest, and leg sweeps and grappling are not particularly significant types of force.  *Cf. Luchtel v. Hagemann*, 623 F.3d 975, 981-82 (9th Cir. 2010) (affirming dismissal of excessive force claim, where the plaintiff "was actively resisting arrest" and behaving in an "unpredictable, irrational manner" and the officers responded by "pinning her to the ground and handcuffing her," causing her to sustain a broken arm and dislocated shoulder, because the plaintiff's "aggressive and resistant behavior weighs in favor of a finding that the officers' use of force was justified").

This would remain true even if, as Plaintiff contends, some aspects of Defendants' conduct were contrary to PPD policy.  *Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("[T]he Fourth Amendment's meaning [does] not change with local law enforcement practices—even practices set by rule."); *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) ("[S]tate departmental regulations do not establish a federal *constitutional* violation."); *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 929 (9th Cir. 2001) ("Whether the deputies violated a state law or an internal departmental policy is not the focus of our inquiry.").  At most, non-compliance with internal policies intended to protect suspects would be "germane to," but not dispositive of, the reasonableness inquiry.  *Scott v. Henrich*, 39 F.3d 912, 915-16 (9th Cir. 1994).  *See also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although such training materials are not dispositive, we may certainly consider a police department's own guidelines when

underlying incident, are relevant when assessing the reasonableness of their conduct in light of the undisputed fact that Defendants *were* aware of the previous night's incident involving the CIT.

evaluating whether a particular use of force is constitutionally unreasonable."). Nor is there any merit to Plaintiff's contention that, because Defendants previously engaged in unreasonable and "provocative" conduct, Andrich was entitled to offer reasonable resistance. Although the parties dispute whether the Ninth Circuit's decisions regarding provocation remain good law in light of the Supreme Court's decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), there is no need to resolve that issue here because there was no provocative conduct by Defendants that might have otherwise justified the resistance by Andrich—as discussed, Defendants were well within their rights to grab Andrich's wrists when attempting to arrest him, and Andrich improperly escalated the encounter by resisting.

The closer question arising from the second stage is whether Officer Kostas used excessive force by repeatedly punching Andrich in the face with closed-fist strikes and using knee strikes, even though Andrich did not—at least according to the evidence viewed in the light most favorable to Plaintiff—throw any punches in return. In *Blankenhorn*, the Ninth Circuit addressed a somewhat similar (although not identical) situation. There, police officers observed the plaintiff trespassing on the premises of a mall from which he had previously been banned. 485 F.3d at 468. One of the officers had encountered the plaintiff a few weeks earlier, and during that interaction the plaintiff was "completely calm" and "cooperative." *Id.* The plaintiff presented evidence that, on the night of the encounter in question, he was calmly talking with one of the officers when the officer grabbed his arm; that he responded by pulling his arm free; that the officer responded by threatening to spray him with mace; that although he responded with some displeasure (by throwing his driver's license on the ground), he "did not take a combative stance, clench his fists, or otherwise make threatening gestures"; that the officer then told him to kneel down so he could be handcuffed; that he refused; that three officers then abruptly "gang-tackled him" without attempting to handcuff him; that he "struggled for several moments before the officers brought him to the ground" but, once on the ground, "did not attempt to prevent the officers from handcuffing him"; and that despite his non-resistance to the

handcuffing attempt, one of the officers then "punched him several times." *Id.* at 478.

In the ensuing § 1983 action, the district court granted summary judgment in the officers' favor on the plaintiff's excessive force claim but the Ninth Circuit reversed.  As relevant here, the court held that the officer's "punching of" the plaintiff could independently give rise to a valid excessive force claim.  *Id.* at 478-80.  In reaching this conclusion, the court acknowledged that "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force." *Id.* at 477.  However, the court also noted that "[a]lthough [the plaintiff] initially resisted being arrested, [the officer's] punches were not necessarily a reasonable response." *Id.* at 480.  The court ultimately held that the justification for the punches turned on whether they were necessary to "take control" of the suspect so he could be handcuffed, and because the plaintiff had presented evidence that he "never pinned his arms underneath his body" or otherwise "maneuver[ed] his arms beneath his body" in a manner that would prevent handcuffing, "a rational jury could find that . . . [the] punches were not reasonably justified by the circumstances as [the officer] claims." *Id.*  Finally, the court also held that the officer was not entitled to qualified immunity on the punching-related aspect of the excessive force claim because existing law would have placed "a reasonable officer on notice that punching [a suspect] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was . . . a Fourth Amendment violation." *Id.* at 481.

Recognizing that it presents a fairly close call, the Court concludes that *Blankenhorn* does not support Plaintiff's contention that the punches and knee strikes by Officer Kostas during the second stage of the encounter were constitutionally excessive.  There, not only did the Ninth Circuit hold that the plaintiff was entitled to use some force when resisting the officers in light of the unlawfulness of their initial attempt to gang-tackle him (which isn't the case here in light of the lawfulness of Defendants' initial use of force against Andrich), but the plaintiff presented evidence that he was known to the officers as calm and cooperative, that he remained calm and cooperative during the encounter and never made any threatening gestures toward the officers, and that he was not making any attempt

to resist handcuffing at the moment the punches were thrown.  Here, in contrast, Officer Kostas threw the punches in the heat of a wild melee in which Andrich (who had been acting erratically and uncooperatively before the encounter) was exhibiting superhuman strength, throwing around officers like ragdolls, and actively resisting Defendants' handcuffing attempts, to the point that a pair of partially fastened handcuffs were dangling off one of his wrists.  Although it is easy to say, "with the 20/20 vision of hindsight" and from "the peace of a judge's chambers," that Officer Kostas's punches and knee strikes were unnecessary, such second-guessing would run afoul of the principle that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396 (cleaned up).  "[A]s the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." *Scott*, 39 F.3d at 915.  Under the factual circumstances of this case, it was reasonable for Officer Kostas to conclude that punches and knee strikes were necessary in light of the severity of the crime at issue, the need to counteract the immediate threat to Defendants' safety, and the fact that Andrich was actively resisting arrest.  *Cf. Gordon v. City and Cnty. of San Francisco*, 2021 WL 5449074, *9 (N.D. Cal. 2021) ("No reasonable jury could find Pacchetti's decision to punch Gordon when he resisted arrest was unreasonable under the Fourth Amendment.  A punch to the head is generally treated as intermediate force that . . . presents a significant intrusion upon an individual's liberty interests.  That said, neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force. . . .  It is undisputed that Pacchetti was aware of Gordon's history of violence, and the officers' body camera videos show Gordon acting confrontationally while actively resisting their efforts to restrain his hands.  Under those circumstances, Pacchetti's interest in hitting Gordon before Gordon could hit him first is obvious.") (cleaned up).

The third stage occurred immediately after Officer Kostas's final flurry of punches.

As noted, the relevant sequence (construed in the light most favorable to Plaintiff) is as follows: (1) Officer Peters told Officer Kostas to stop punching Andrich and step away; (2) Officer Peters deployed his Taser, which hit Andrich in the back; (3) Andrich fell to the ground, pulled out the Taser prongs without seemingly "being fazed by it," quickly got back to his feet, and started walking away; (4) Officer Kostas deployed his Taser, which again hit Andrich in the back; (5) Andrich again did not stop and continued walking away; and (6) Officer Kostas pursued Andrich on foot.

The Ninth Circuit has recognized that Tasers deliver a "painful and frightening blow" and "constitute an intermediate or medium, though not insignificant, quantum of force." *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (cleaned up). However, the Ninth Circuit has also recognized that Tasers can play an "important role . . . in law enforcement" because "[t]he ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike." *Id.* Thus, the "most important" factor in evaluating the reasonableness of the use of a Taser "is whether the suspect posed an "immediate threat to the safety of the officers or others." *Id.* (internal citation and quotation marks omitted). It is not enough, "by itself," that the suspect may have engaged in "volatile, erratic conduct." *Id.*

In *Bryan*, the Ninth Circuit applied these principles to reverse a grant of summary judgment in favor of an officer who had deployed a Taser against "a disturbed and upset young man, not an immediately threatening one," who was "twenty to twenty-five feet away and not attempting to flee." *Id.* at 822, 827. The court emphasized that although the suspect "had shouted expletives to himself while pulling his car over and had taken to shouting gibberish, and more expletives, outside his car," "at no point did he level a physical or verbal threat against" the officer. *Id.* at 826-27.

In contrast, the Ninth Circuit has rejected excessive force claims against officers for deploying a Taser only after less-intrusive attempts to detain an uncooperative suspect proved unsuccessful. For example, in *Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir.

2012), police officers were "greeted by chaos" when they entered a bedroom and observed evidence suggesting the suspect, who was believed to be unarmed, had just committed serious crimes against a child. *Id.* at 1170-71. An officer warned the suspect to "[l]et go of the child or I'm going to tase you," and when the suspect failed to comply, the officer deployed his Taser. *Id.* at 1171. Although the probes hit the suspect, the Taser "did not appear to affect [the suspect] as intended." *Id.* As a result, the officer pulled the Taser's trigger a second time, but the suspect again was not incapacitated. *Id.* At this point in the encounter, another officer extracted the child from the room while the suspect was kicking the officer who had deployed the Taser. *Id.* In response, the officer redeployed the Taser in a different mode that "does not incapacitate the target, but instead encourages the suspect to comply by causing pain." *Id.* Over a span of three minutes, the officer (and a colleague) repeatedly used the Taser in this mode, causing the suspect to "flail[] wildly." *Id.* Afterward, the suspect went into cardiac arrest and died. *Id.* In the ensuing § 1983 action, the officers were accused of engaging in excessive force through their continued deployment of the Taser over the course of the encounter, but the district court granted the officers' motion for summary judgment and the Ninth Circuit affirmed. Although the court acknowledged that "considerable force was used here" and that the force "constituted a not-insignificant potential intrusion upon [the suspect's] Fourth Amendment rights," it concluded that the force was reasonable because (1) the officers had reason to believe that serious crimes had been committed, (2) the suspect was "actively resisting arrest," and (3) "the officers could reasonably have believed that they were themselves in danger." *Id.* at 1174-76.

Similarly, in *Liberti v. City of Scottsdale*, 2018 WL 4335442 (D. Ariz. 2018), the officers—like Defendants here—responded to a 911 call from a business reporting that a patron was engaging in erratic behavior. *Id.* at *1. There, as here, the suspect had left by the time the officers arrived, but the officers later encountered the suspect nearby. *Id.* There, as here, the officers attempted to physically grab and restrain the suspect after he disregarded some of their commands, but the suspect "jerked away, briefly grappled with

the Officers, and fled." *Id.*   And there, as here, the officers deployed a Taser in an unsuccessful attempt to stop the suspect before later fatally shooting the suspect in response to a perceived threat.  *Id.* at *1-2.  In the ensuing § 1983 action, the district court rejected an excessive force claim premised on the deployment of the Taser, explaining that when the officer "deployed her TASER, she had already attempted verbal commands and empty-hand coercion.  [The suspect] at that point was wielding a knife, had assaulted [the officer] while resisting arrest, and still was apparently under the influence of methamphetamine.  The government's interest in subduing [the suspect], who was continuing to disobey police commands and becoming a significant threat to the Officers and the public, had become substantial.  No reasonable jury could find that [the officer's] use of force in tasing [the suspect] was objectively unreasonable."  *Id.* at *5.  The Ninth Circuit affirmed, holding that "[n]o existing precedent would have given the officers notice that [the officers'] grabbing of [the suspect's] elbow in an attempt to get him to sit down or that the officers' additional attempts to subdue him when he fled were unconstitutional."  *Liberti v. City of Scottsdale*, 816 F. App'x 89, 91 (9th Cir. 2020).

And again, in *Beaver v. City of Federal Way*, 301 F. App'x 704 (9th Cir. 2008), the Ninth Circuit held that an officer's the use of a Taser was "not patently offensive of [the suspect's] constitutional rights" where the suspect "was suspected of committing . . . a felony crime," "was attempting to flee from [the] officer," "ignored [the officer's] warning to stop," and "remained non-compliant to the officers' commands."  *Id.* at 705.

This case is much closer to *Marquez*, *Liberti*, and *Beaver* than it is to *Bryan*.  At the time the Tasers were employed, all three of the *Graham* factors supported the application of not-insignificant levels of force against Andrich: (1) Defendants had reason to believe that Andrich had committed an array of crimes (not just the initial misdemeanor trespassing offense); (2) Defendants had reason to believe that Andrich posed an immediate threat to their safety (he had just thrown them around like ragdolls, using superhuman strength, as they tried to arrest and handcuff him, he had a partially fastened handcuff dangling from his wrist, and he was only a few feet away from them); and (3) Andrich was actively

resisting arrest and trying to flee.  Although Plaintiff has presented evidence that the Tasers hit Andrich in the back (which contradicts Defendants' testimony that the Tasers hit Andrich in the chest), the Court does not see how this changes the constitutional analysis. By all accounts, this was a wild, chaotic scene and Andrich was only a few feet away from Defendants when they deployed the Tasers.  This is a much different scenario than *Bryan*, where the suspect was "standing twenty to twenty-five feet away and not attempting to flee." 630 F.3d at 822.  For these reasons, Defendants' Taser use during the third stage of the encounter was reasonable under the circumstances and did not violate Andrich's constitutional right to be free from excessive force.  *See generally Roell v. Hamilton Cnty.*, 870 F.3d 471, 481 (6th Cir. 2017) (citing earlier Sixth Circuit decision for the proposition that "numerous cases hold[] that an officer's use of a taser against a plaintiff who is actively resisting arrest by physically struggling with, threatening, or disobeying officers is not a violation of the plaintiff's clearly established Fourth Amendment rights, even if the plaintiff is suspected of committing only a misdemeanor") (cleaned up).

### ii.   Lethal Force

In addition to challenging the reasonableness of Defendants' use of non-lethal force during the initial stages of the encounter, Plaintiff argues that Officer Kostas used constitutionally excessive force when shooting Andrich during the final portion of the encounter.

"An officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Scott*, 39 F.3d at 914 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11.  However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, *if the suspect threatens the officer with a weapon* or there is probable cause to believe

1    that he has committed a crime involving the infliction or threatened infliction of serious

2    physical harm, deadly force may be used if necessary to prevent escape, and if,

3    *where feasible*, some warning has been given." *Id.* at 11-12 (emphases added).

4         Here, the constitutional analysis is straightforward in light of the factual

5    determinations made in earlier portions of this order.  Although Plaintiff seeks to create a

6    factual dispute about whether Andrich ever lunged or swung at Officer Kostas in a manner

7    that created an immediate threat to Officer Kostas's safety, those arguments are foreclosed

8    by the cell-phone video, which clearly depicts Andrich stopping, turning toward Officer

9    Kostas, raising his hand (which was gripping a dangling handcuff in a dangerous manner),

10   and quickly moving that hand toward Officer Kostas.  Immediately afterward, Officer

11   Kostas raised his weapon and fired.  It was objectively reasonable for Officer Kostas to

12   perceive Andrich's conduct as an immediate threat to his safety and Officer Kostas had no

13   reasonable opportunity to give a verbal warning before shooting in light of his close

14   proximity to Andrich.

15        The Ninth Circuit has repeatedly held that when an officer reasonably—even if

16   mistakenly—concludes that a nearby suspect is moving to use a weapon against him, the

17   officer is constitutionally permitted to respond by utilizing lethal force without providing

18   a verbal warning.  *See, e.g.*, *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211,

19   1229-30 (9th Cir. 2014) ("[T]he officers' use of deadly force—*viewed from the standpoint*

20   *of the moment of the shooting*—was reasonable as a matter of law. . . .  Although Sheehan

21   insists that she was blinded and disabled by the pepper spray, she indisputably continued

22   to hold the knife and advance toward the officers, in cramped quarters, after being sprayed.

23   Thus, even if Sheehan *in fact* was not intending to attack the officers at that point in the

24   confrontation, the officers reasonably believed they were still in danger.  At the moment of

25   the shooting, the defensive use of deadly force, although unfortunate, did not violate the

26   Fourth Amendment."); *Long v. City and Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir.

27   2007) ("[W]hether Long actually fired his rifle at these officers is also immaterial.  It is

28   enough that Sterling heard the radio transmission and observed Long point the rifle in the

officers' direction."); *Corrales v. Impastato*, 650 F. App'x 540, 541-42 (9th Cir. 2016) (use of lethal force was reasonable where the suspect "rushed toward [the officer] while pulling his previously concealed hand from his waistband and forming it into a fist with a single, hooked finger extended, in an attempt to scare [the officer] into believing that he had a gun and he was going to try to kill him," because the officer "had probable cause to believe that [the suspect] posed a significant threat of death or serious physical injury to himself or others" and the officer "was not required to issue a warning before firing . . . under the rapidly changing circumstances") (cleaned up).  Indeed, even in cases (unlike this one) where a factual dispute about the existence of an immediate threat precluded the entry of judgment in the officer's favor, the Ninth Circuit has emphasized that officers may use lethal force in response to a perceived attacking movement by a nearby suspect with a weapon.  *See, e.g.*, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) ("It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason.  Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire."); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (recognizing that the Fourth Amendment does not "always require[] officers to delay their fire until a suspect turns his weapon on them" because "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat").  These principles compel the entry of summary judgment in Officer Kostas's favor with respect to any excessive force claim premised on the shooting.  Tragic as the shooting may have been, it did not violate the Constitution.

### b.    **Excessive Force—Clearly Established Law**

Although Defendants are entitled to summary judgment on Count One based on the first prong of the qualified-immunity analysis, the Court will, in an abundance of caution, address the second prong.

A government official's conduct violates "clearly established" law when "the

contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (cleaned up). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117. *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (citation and internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . .  Except in the rare case of an 'obvious' instance of constitutional misconduct . . . , Plaintiffs must *identify* a case where an officer acting under similar circumstances  . . . was held to have violated the Fourth Amendment.  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful.") (cleaned up).  Additionally, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp*, 871 F.3d at 911 (citation omitted). *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right

allegedly violated was clearly established at the time of the alleged misconduct.").[14]

Although Plaintiff purports to identify an array of earlier cases establishing that the conduct at issue here was unconstitutional, the Court agrees with Defendants that Plaintiff's cited cases are too factually dissimilar to have provided fair notice to Defendants.  For example, Plaintiff identifies *Blankenhorn* as her best case supporting the denial of qualified immunity as to Defendants' use of non-lethal force (Doc. 89 at 18), but *Blankenhorn* does not support Plaintiff's position for the reasons stated above.  There, unlike here, the officers' initial use of force when attempting to arrest the suspect (the gang-tackle) was excessive and provocative, the suspect was known to the officers as calm and cooperative and remained calm and cooperative throughout the encounter, and the officer's punches were unnecessary to complete the handcuffing attempt.  At a minimum, *Blankenhorn* is too factually dissimilar to serve as the sort of precedent that would qualify as clearly established authority for qualified-immunity purposes.[15]

Meanwhile, the lethal force cases cited by Plaintiff (Doc. 89 at 18-19) are distinguishable because they establish, at most, that the use of lethal force is impermissible when a suspect, although armed with a weapon, does *not* make any furtive or quick motions with the weapon that might be reasonably perceived as posing an immediate threat of harm to officers and/or when it is feasible to provide a warning before shooting:

- *Hayes v. County of San Diego*, 736 F.3d 1223, 1233-34 (9th Cir. 2013) ("Hayes

---

[14]    Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that *Defendants* bear the burden of proof on the disputed qualified-immunity issues presented in this appeal. . . .  [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that the *plaintiff* bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (cleaned up).

[15]    Similarly, Plaintiff's reliance on *Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021), is misplaced because the Ninth Circuit denied qualified immunity there based on the presence of evidence that the suspect "was not actively resisting arrest or attempting to evade arrest by flight" and "was not resisting in any way until after he was taken down." *Id.* at 1123 (internal citation and quotation marks omitted).  Those are not the facts here, even when the evidence is construed in the light most favorable to Plaintiff.

appears to have been complying with Deputy King's order to show his hands when Hayes raised his hands and revealed the knife.  His statement that the deputies could take him to jail further suggests his compliance at the time.  Although Hayes was walking towards the deputies, he was not charging them, and had not been ordered to stop.  He had committed no crime and had followed all orders from the deputies at the time he was shot. . . . [T]hreatening an officer with a weapon does justify the use of deadly force.  There is no clear evidence, however, that Hayes was threatening the officers with the knife here.") (internal citations omitted).

▪ *S.B. v. County of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) ("Moses shot Brown as soon as his hand touched the knife; . . . Brown was on his knees when he was shot; . . . when he grabbed the knife, Brown was approximately six to eight feet away from Vories; . . . Moses could not see the other officers at the time Brown grabbed the knife; . . . after Brown went for the knife, the officers did not order him to drop the knife or warn that he was about to be shot; and . . . Vories had a non-lethal option—a Taser gun.").

▪ *Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2016) ("[W]hen viewing the facts in the light most favorable to Ms. Hughes, the record does not support Corporal Kisela's perception of an immediate threat.  Officer Garcia told Tucson police that Ms. Hughes did not raise the knife and did not make any aggressive or threatening actions toward Ms. Chadwick.  Officer Kunz similarly did not see Ms. Hughes raise her arm.  Ms. Chadwick describes Ms. Hughes as having been composed and non-threatening immediately prior to the shooting.").

▪ *Chien Van Bui v. City and Cnty. of San Francisco*, 699 F. App'x 614, 615 (9th Cir. 2017) ("Although Bui was holding an 'X-Acto' knife in his hand when he was shot, he did not raise his arm or make any other threatening gestures.  On the contrary, on Plaintiffs' facts, Bui assumed a cringing, fearful posture as he shuffled slowly down the hallway toward the officers and was turning away from the officers when they used deadly force. . . .  A reasonable jury could conclude that the relatively slight and somewhat impaired Bui, who made no threatening motions with the small blade in the officers'

presence, did not present a significant threat of death or serious physical injury.").

▪ *N.E.M. v. City of Salinas*, 761 F. App'x 698, 699-700 (9th Cir. 2019) ("At the time of the shooting, Mejia-Gomez [who was holding garden shears] turned toward the officers in a 'normal' manner.  His turning was not sudden. . . .  At the time of the shooting, it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions.").

▪ *Bascomb v. City of Seattle*, 9 F.3d 1550, *1 (9th Cir. 1993) (unpub.) ("According to evidence submitted by the plaintiff, Bascomb was turning away from the officer and could not have been perceived as a looming threat.").

▪ *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) ("Even though Harris was armed, he made no aggressive move of any kind when Horiuchi started shooting; instead, with the others, he ran back toward the cabin from which they had recently emerged. . . .  *Graham*'s totality of the circumstances test does not permit the use of deadly force to kill a suspect who is running back to a cabin where he is temporarily staying and who makes no threatening movement of any kind. . . .").

▪ *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("[T]he police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time.").

▪ *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1110, 1116 (9th Cir. 2016) (although "Officer Soeth maintained in the district court that he shot Newmaker after [Newmaker] grabbed Soeth's police baton . . . [and] was standing upright and was swinging the baton violently toward Sergeant Charles Ellebrecht at head height," "[a] reasonable jury could conclude that Soeth and Ellebrecht were wrong when they claimed that Newmaker grabbed the baton").

▪ *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1002 (D. Ariz. 2012) ("[T]here was some danger that David may drop D.H., but at the time he was shot he did nothing to

suggest an immediate danger that he would throw her to the ground.  Furthermore, David was not armed, was not evading the police . . . , and was not warned that he would be shot if he did not comply with the officers' commands.").

Put simply, Plaintiff's cited cases would not have provided notice to Officer Kostas that the use of lethal force was impermissible under the circumstances of this case—where an agitated suspect who had previously resisted arrest in a physically aggressive manner, and against whom less-intrusive forms of force (including two Taser deployments) had proved ineffective, stops moving away from a pursuing offer, turns toward the officer, raises his hand in close proximity to the officer while holding a dangerous makeshift weapon, and quickly moves that hand toward the officer in an objectively threatening manner.  Thus, because the law governing the shooting decision was not "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law," *Shafer*, 868 F.3d at 1117, the absence of clearly established law provides an additional reason why Defendants are entitled to summary judgment on Count One.

III.    Count Two: Denial Of Medical Care

A.    **The Parties' Arguments**

In Count Two of the SAC, Plaintiff asserts a § 1983 claim premised on the theory that "the wrongful denial of medical care by [Defendants] deprived [Andrich] of his right to receive medical care, treatment, and monitoring while seized or in custody as guaranteed . . . under the Fourteenth Amendment to the United States Constitution."  (Doc. 31 ¶ 42.) Elsewhere in the SAC, Plaintiff elaborates that "[a]fter [Andrich] was unlawfully shot, [Defendants] failed to provide timely medical care to [Andrich], and also failed to timely report the use of force/shooting to a supervisor.  Twenty-nine minutes had passed from the time [Andrich] was shot before [Defendants] timely reported the use of force and summoned medical care for [Andrich's] fatal gunshot wound."  (*Id.* ¶ 24.)

Defendants argue they were not deliberately indifferent to Andrich's serious medical needs because all that is constitutionally required is the prompt summoning of

medical assistance, Officer Kostas requested emergency medical services ("EMS") right after the shooting, and EMS arrived about five minutes later.   (Doc. 86 at 18-20.) Defendants also note that the allegation in the SAC that they waited 29 minutes before summoning medical care "is clearly incorrect."   (*Id.*)   Alternatively, Defendants contend that Plaintiff cannot prove causation with respect to Count Two because "Plaintiff has not hired any medical expert to opine that [Andrich's] injuries were survivable and that had the Defendants acted differently, that his prognosis would have been different." (*Id.*)

Plaintiff responds that "Defendants violated their own training and PPD policies by not controlling or attempting to stop Mr. Andrich's bleeding for five minutes.  Allowing Mr. Andrich to bleed out before any ambulance arrived on scene without any care provided violates the constitution and essentially prevented Mr. Andrich's version of the story from ever being disclosed.  This is enough for a constitutional violation[,] as whether Defendants satisfied their constitutional obligation to provide 'prompt' medical attention to Mr. Andrich is a jury question." (Doc. 89 at 20.)  Plaintiff also disputes Defendants' assertion that the time stamps on the surveillance video and the incident report are synchronized. (*Id.*)  Finally, as for causation, Plaintiff contends that an expert isn't required because "the medical examiner opined that Mr. Andrich's chances of survival would have increased with CPR provided." (*Id.*)  Plaintiff concludes: "Simply, Defendants failed to provide Mr. Andrich medical care for minimally five minutes in violation of PPD policies." (*Id.*)

In reply, Defendants accuse Plaintiff of "attempt[ing] to move the goalposts" on Count Two, because the allegation that they were negligent by not controlling the bleeding for five minutes differs significantly from the allegation in the SAC that "[t]wenty-nine minutes had passed from the time [Andrich] was shot before [Defendants] timely reported the use of force and summoned medical care for [Andrich's] fatal gunshot wound." (Doc. 93 at 11-12.)  At any rate, Defendants reassert that they were only constitutionally required to promptly summon EMS and were not required to perform CPR or blood-loss prevention. (*Id.*)  Defendants also contend that "Plaintiff cites no evidence to contradict the testimony of Officer Kostas that he began performing life-saving measures prior to the arrival of

1   medical personnel."  (*Id.*)

2       **B.**   **Analysis**

3       Defendants are entitled to summary judgment on Count Two.  "Just as the Fourth

4   Amendment does not require a police officer to use the least intrusive method of

5   arrest, neither does it require an officer to provide what hindsight reveals to be the most

6   effective medical care for an arrested suspect."  *Tatum v. City & Cnty. of San Francisco*,

7   441 F.3d 1090, 1098 (9th Cir. 2006) (internal citation omitted).  "Due process requires that

8   police officers seek the necessary medical attention for a detainee when he or she has been

9   injured while being apprehended by either promptly summoning the necessary medical

10  help or by taking the injured detainee to a hospital."  *Maddox v. City of Los Angele*s, 792

11  F.2d 1408, 1415 (9th Cir. 1986).   As relevant here, "a police officer who promptly

12  summons the necessary medical assistance has acted reasonably for purposes of the Fourth

13  Amendment, even if the officer did not administer CPR."  *Tatum*, 441 F.3d at 1099.

14  Similarly, an officer is not required to personally engage in other types of life-saving

15  measures, such as efforts to stop or control bleeding, so long as the officer promptly

16  summons medical assistance.  *See, e.g.*, *Krause v. County of Mohave*, 2020 WL 2541728,

17  *12 (D. Ariz. 2020) ("[I]t is evident that the deputies did not act with deliberate indifference

18  to Krause's medical needs.  The deputies requested emergency medical services within

19  sixty seconds of the shooting.   Emergency medical care arrived within eight minutes.

20  Plaintiff fails to cite any authority establishing that the deputies['] prompt request for

21  emergency medical care constitutes deliberate indifference.  There is no affirmative duty

22  for the officers to personally administer first aid as Plaintiff suggests.") (citations omitted);

23  *Dunbar v. City of Riverside*, 2014 WL 12962881, *3-6 (C.D. Cal. 2014) (no constitutional

24  violation where officers fired multiple shots at a suspect "causing immediate, arterial

25  bleeding" and failed to personally provide medical assistance as the suspect was saying "I

26  can't breathe," "please," and "help me," because the officers placed a radio call for

27  emergency medical assistance  "immediately after the shooting" and the plaintiff did not

28  "identify a single case that holds that personal medical care is constitutionally required");

1   *Duenez v. City of Manteca*, 2013 WL 6816375, *11 (E.D. Cal. 2013) ("Plaintiffs argue that

2   the constitution requires the officers to personally administer medical care to a person

3   whom they injure.  However, plaintiffs . . . do [not] identify even a single case that holds

4   that personal medical attention is required by the constitution.").

5           Here, the undisputed evidence establishes that Defendants called for emergency

6   medical assistance within a few seconds of the shooting and that medical personnel arrived

7   about five minutes later.  This timeline is established by Defendants' undisputed testimony

8   (Doc. 86-2 at 94, 107) and is corroborated by multiple pieces of evidence in the record,

9   including the surveillance video from a nearby hotel, which reflects that Andrich fell to the

10  ground at 7:45 (MSJ Exhibit No. 11); the CAD report, which likewise reflects that Andrich

11  went to the ground ("SUBJ DOWN") at 7:45 and also reflects that a call for medical

12  assistance ("AMBULANCE") was made one second later, at around 7:46 (Doc. 86-2 at

13  41); the Phoenix Fire Department's incident report, which reflects that Defendants' call for

14  emergency medical assistance was received at 7:45:33 and that EMS personnel arrived at

15  the scene at 7:50:53 (*id.* at 109-10); and the medical records from the hospital, which reflect

16  that Andrich was brought to the hospital by EMS personnel at "[a]pproximately 08:00" and

17  "had been coded for 10 minutes prior to his arrival" (*id.* at 113).  Although Plaintiff

18  speculates that the time stamps on some of these exhibits may not be synchronized, Plaintiff

19  presents no evidence in support of this theory and does not, at any rate, proffer any evidence

20  that would create a legitimate dispute of fact concerning the relevant timeline.  Thus, even

21  assuming that Plaintiff has not forfeited her ability to pursue a claim based on Defendants'

22  failure to personally provide medical care in the aftermath of the accident (which appears

23  to be different from the theory articulated in the SAC), no reasonable juror could rule in

24  Plaintiff's favor on that claim in light of Defendants' prompt efforts to summon EMS

25  personnel to the scene.  This conclusion makes it unnecessary to resolve Defendants'

26  alternative challenge to the sufficiency of Plaintiff's causation evidence.

27           …

28           …

Accordingly,

**IT IS ORDERED** that:

1.      Defendants' motion for summary judgment (Doc. 86), is **granted**.

2.      Plaintiff's motion to exclude certain expert opinions (Doc. 78) is **denied as moot**.

3.      The Clerk shall enter judgment accordingly and terminate this action.

Dated this 21st day of July, 2022.

Dominic W. Lanza
United States District Judge